UNITED STATES, Appellee

v

ISAAC J. HURT, Sergeant, U. S. Army, Appellant

9 USCMA 735, 27 CMR 3

736

738

743

744

745

747

748

No. 10,533
Decided October 7, 1958

*First Lieutenant William L. Garwood* argued the cause for Appellant, Accused. With him on the brief were *Colonel James Garnett, Colonel J. M. Pitzer, Major Frank C. Stetson, Captain Arnold I. Melnick,* and *First Lieutenant Robert J. Hearon, Jr.*

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief were *Major Thomas J. Nichols* and *First Lieutenant Paul R. Walsh.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A five-year-old Okinawan girl was found in an abandoned quarry off a coastal road bordering the China Sea about 7:30 a.m., September 4, 1955. She was dead. Medical examination disclosed she had been violated and that death occurred about 10:00 p.m. the previous night. The cause of death was suffocation which could have resulted from pressure of the fingers of an adult on the windpipe. Two days later the accused was arrested. He was charged with murder committed in the course of a felony and rape. A general court-martial, which at the accused's request included enlisted personnel, convicted him of the charges and sentenced him to death. The convening authority and board of review affirmed the conviction. The case is now before us on mandatory review under the provisions of Article 67(b)(1), Uniform Code of Military Justice, 10 USC § 867.

With the accused's life at stake, defense counsel, at trial and on appeal, have explored every legal avenue open to them. Nineteen assignments of error have been set out before this Court. The principal contention is that the evidence is not sufficient to support the findings of guilty, an issue which divided the board of review below. The importance of the principal issue and the fact of division of opinion among the board of review members bring to the forefront certain procedures followed by the board of review which are vigorously attacked by appellate defense counsel.

At the trial, a witness for the prosecution testified he saw a man get out of a car, pick up the little girl, and drive away. It was dark when the incident occurred. He described the wearing apparel of the man, and on direct examination identified the car outside the courtroom as the one he saw on the fatal night. To test the identification, he was asked on cross-examination what the color of the seat covers were. He answered that he had "seen it like it was white." The Government introduced into evidence pieces of the seat cover from the accused's car. These were not, however, forwarded with the record of trial. Instead, photographs were substituted and the physical exhibits were withdrawn. The record of trial shows that, in accordance with AR 190–22, the exhibits were placed in the custody of the Chief, Investigations Branch, 8118 Army Unit, "pending review" of the case.

When the case came before the board of review, appellate defense counsel contended the evidence was insufficient to support the findings of guilty. An important part of his argument was directed against the testimony of the Government's witness, an eight and one-half-year-old boy. He stressed the fact that another Government witness described the seat covers as "green plaid." In reply, Government counsel maintained that the young witness merely "erred" in describing the color. The board of review "called for and received" one of the pieces of seat cover and "observed it under various light conditions." It determined that there were strips of white in the plaid pattern and these were "predominant when viewed in a darkened room." This appearance, it said in its opinion, "conforms with the scientific fact that white reflects light while darker colors absorb light." The board of review did not inform counsel it had requested the exhibit, and had examined it in different degrees of light. But it did, as noted

above, refer to the matter in its opinion.

The nature or quality of an item of physical evidence, such as a bulk, intrinsic value, or perishability, may make it impractical to include it in the record of trial submitted to an appellate body for review. In that event, a photograph or suitable description is usually set out in the record in place of the exhibit. See Manual for Courts-Martial, United States, 1951, paragraph 138c. However, the substitution does not mean that the appellate authority cannot obtain and examine the actual evidence. The exhibit is part of the evidence and the appellate body can request it for direct, personal inspection. See Rules 75(h) and (i), Federal Rules of Civil Procedure. Consequently, the board of review did not err in requesting the actual exhibit.[1] The questions then are whether the procedure it followed was correct and, if not, whether the procedure prejudiced the accused in any material respect.

As a general rule, a party to a proceeding who will be affected by a proposed action therein is entitled to notice of the action and to an opportunity to present his views in regard to it. On principle, therefore, the board of review should have informed counsel of its request for the seat cover and of its proposed examination of it. The board of review should also have accorded counsel an opportunity to explain or refute the proposed use of the exhibit. These things were not done. The board of review excused its oversight by equating its action to the right of the jury to take exhibits in evidence into the jury room. That right is not absolute but rests in the discretion of the trial judge, exercised sua sponte or on request of the jury or counsel. Robinson v United States, 210 F2d 29 (CA DC Cir) (1954); Rumely v United States, 293 Fed 532 (CA 2d Cir) (1923). Since, in a sense, the board of review acts both as a judge and a jury, it apparently believed it was enough to give itself permission to consider the exhibit. However, there may be limitations on the use of the exhibit in the fact-finding situation. Steele v United States, 222 F2d 628 (CA 5th Cir) (1955); see also Wilson v United States, 116 Fed 484 (CA 9th Cir) (1902). A party to the proceedings is entitled to the opportunity to assure himself that the fact finder is made fully aware of the limitations. That opportunity was not accorded to the accused. But, under the circumstances of the case, we cannot say that the board of review acted to his prejudice.

In challenging the sufficiency of the evidence, appellate defense counsel attempted, on several grounds, to discredit the youth who testified for the Government. One of the grounds was the witness's statement on cross-examination that he had "seen it [the seat cover] like it was white." This statement was contrasted with the unqualified statement by another witness that the seat cover in the accused's car was a "green plaid." Counsel, therefore, invited the board of review to compare the lad's testimony with the actual color of the seat cover. Since the seat cover had not been forwarded with the record of trial, the only thing the board of review could do to comply with the invitation was to request the cover and examine it. That is just what the board of review did.

Having been asked to make the comparison, the board of review assumed it could do so at its own time and in its own place. In this respect, it correctly compared its action to that of a jury which was allowed to take physical evidence with it into the jury room for personal examination. The result was unfavorable to the accused. But he cannot complain of that. He asked for the comparison. The fact it did not go

---

[1] Two exhibits were, in fact, requested by the board of review. One, however, is not the subject of dispute because the examination of it apparently did not enter into the final determination of the sufficiency of the evidence.

the way he wanted it to go is no ground for complaint. What is left to him, therefore, is simply the procedure followed in the examination.

Two possible grounds of invalidity are present. The first is that the exhibit was not in the same condition at the time it was reviewed by the board of review as it was in when offered into evidence at the trial. The cover was in the hands of an official custodian for safekeeping and it was received by the board of review through registered mail. It must also be borne in mind that this is not an exhibit offered by a party at the trial to show a condition previous to trial. In that instance, the party offering the evidence must satisfy the court that the exhibit is in substantially the same condition it was in at the time of the event in issue. We are dealing with matter already in evidence. If it is contended that the condition is changed from the time of trial to the time of appeal, the burden of showing such a change is on the one asserting it. The seat cover was affixed to the original record of trial transmitted to this Court. It has been available to appellate defense counsel for inspection and comparison and they have not called our attention to any changes. The exhibit shows no indication whatever of tampering and it corresponds in detail to the photograph substituted for it at the trial. There is, therefore, no suggestion of harm as a result of the board of review's procedure in this aspect of the case.

The second possibility of harm in the examination is the manner in which it was conducted. Did the board of review examine the seat cover under conditions which are susceptible to different explanations or conclusions? In its opinion, the board of review said it looked at the seat cover under "various light conditions" and what it saw confirmed a "scientific fact," namely, that "white reflects light while darker colors absorb light." Hence, in the dark the strands of white in the plaid pattern were "predominant."[2] Since the witness testified that he saw the accused's car in the dark, the board of review had to examine the seat cover in the dark if it was to make the comparison appellate defense counsel had invited it to make. No explanation of what it saw was necessary. The exhibit spoke for itself. It bore out the "scientific fact" that white reflects light. In short, the board of review merely made a "critical examination" of the exhibit itself. Espy v State, 54 Wyo 291, 92 P2d 549, 556. It did not experiment with the exhibit by subjecting it to new and different conditions than those shown by the evidence. Wilson v United States, supra; People v Conkling, 111 Cal 616, 44 Pac 314. Consequently, no basis for prejudice exists in this part of the board of review's action.

It will be recalled that the board of review was divided in affirmance of the findings of guilty. One of the members of the two-member majority was Lieutenant Colonel Lee. The accused contends that Colonel Lee was disqualified from participating in the decision. He alleges that the Colonel occupied incompatible positions in regard to the case.

Before publication of the opinion and decision in this case, Colonel Lee was transferred from the board of review to the Government Appellate Division[3] and served as counsel for the Government in a number of cases before other boards of review. The claim of disqualification was asserted as part of a petition for reconsideration. In a memorandum attached to the record, Colonel Lee reviewed his actions in the

---

[2] The material is a woven fabric with a plaid or box design. On looking at the material the over-all impression is that it is green in color. However, starting from the top, the colors of the strands in each box are as follows: *Horizontal*—3 lines of white, 1 black, 4 green, 1 black, 1 red, 3 gray, 2 green, 2 black, 1 red, followed by a repeat of 3 lines of white. *Vertical*—2 strands of white, 2 gray, 2 green, and again 2 white.

[3] The Government Appellate Division is the section within the Judge Advocate General's Office from which lawyers are assigned to represent the Government in cases before boards of review and this Court.

case during his tenure as a board of review member and after his assignment to the Government Appellate Division. He says he was assigned to the board of review on June 6, 1956. He sat in the hearing on this case with Colonel Guimond and Baron. The hearing was followed by "many hours of discussion and argument." He and Colonel Baron finally determined to affirm the findings of guilty. In early September 1956, a draft form of opinion was completed. Colonel Guimond, however, desired more time to reach a final decision, particularly because he was engaged in the preparation of an opinion in another case. As a result, the draft opinion in this case was laid aside. In early October, Colonel Lee went home on leave because of illness in his family. The work load on the remaining members of the board increased during his absence. Apparently as a result of this, on October 17, Colonel Lee was released from the board of review and transferred to the Government Appellate Division as an appellate Government lawyer. Another officer of the Judge Advocate General Corps was appointed to replace him. On October 18, 1956, Colonel Lee was reassigned to the board of review for several cases in which he had heard oral argument or had taken some action. One of these cases is the instant case.

Colonel Guimond decided to dissent but he needed time to prepare his opinion. In the meanwhile, Colonel Lee was assigned as Government counsel to cases before other boards of review. On December 28, the majority and dissenting opinion below were published.

Appellate defense counsel do not question the truth of the matters set out by Colonel Lee. They maintain that in a capital case the proceedings should, at the very least, be of "unimpeachable fairness" and avoid even an appearance of impurity. United States v Zagar, 5 USCMA 410, 414, 18 CMR 34; United States v Walters, 4 USCMA 617, 630, 16 CMR 191. They point to the fact that the opinion of the board of review is

dated in December, several months after Colonel Lee had been actively engaged as Government counsel in cases before other boards of review. They insist that the "shield of secrecy" which covers the deliberation of a court or jury stands in the way of any attempt to explain Colonel Lee's allegedly incompatible position as a judge in one case and a lawyer for the Government in others.[4] No provision in the Uniform Code or in the Manual for Courts-Martial, supra, provides for disqualification of a board of review member for bias or prejudice or for untoward appearance. However, it has been correctly observed that "inherent in the member's function is a requirement of impartiality." Feld, Manual of Courts-Martial Practice and Appeal, § 101 (1957). Consequently, any relationship of which a board member is a part which casts doubt upon his impartiality is ground for disqualification. Three statutes define the occasions for the disqualification of a judge in the Federal courts. 28 USC §§ 47, 144, and 455. See also United States v Schuller, 5 USCMA 101, 106, 17 CMR 101. Since there are no specific statutes for the military, we look to the civil statutes for guidance. United States v Knudson, 4 USCMA 587, 590, 16 CMR 161.

Particularly applicable to the facts in this case are the provisions of sections 144 and 455. Section 144 provides for disqualification because of "personal bias or prejudice" for or against a party to the proceedings. Section 455 provides as follows:

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

It is not contended here, and there is

<hr>

[4] It may be doubted that there is a "shield of secrecy" in a situation of this kind. See James v Clements, 217 Fed 51 (CA5th Cir) (1914). However, we lay aside the doubt and consider the matter on the assumption that the "shield" exists and cannot be lowered.

no evidence to show, that Colonel Lee had "personal bias or prejudice" against the accused or in favor of the Government. In a motion for reconsideration presented to the board of review, appellate defense counsel specifically said the attack on Colonel Lee's participation in the decision of the case was not based on any actual improper influence but on his "inconsistent positions." If he was disqualified from acting as a board of review member, it must be because he was "so related to or connected with" the Government or its attorneys in this case as to make it improper for him to sit.

Common sense tells us, and the law recognizes, that not every relationship between the judge and a party or his counsel is disqualifying. Some associations are so remote or so patently tenuous as to preclude any suggestion of impropriety. See Frank, "Disqualification of Judges," 56 Yale Law Journal 605 (1947). A ready example is that of the district attorney who is appointed a judge. The fact that he represented the Government as district attorney does not stamp him so "government-minded" as to disqualify him from sitting generally in cases in which the Government is a party, as distinguished from a specific case in which he had previously acted as district attorney. United States v Vasilick, 160 F2d 631 (CA3d Cir) (1947); United States v Schuller, supra.

In the military, the problem of disqualifying relationships must be considered in light of the fact that the "judges" and the lawyers are, for the most part, members of a single organization, and are, at all times, subject to assignment to different duties. Thus, the fact that Colonel Lee is a member of the Judge Advocate Corps carries no imputation of partiality towards the Government. The same may be said of the lawyers assigned to the Appellate Defense Division in the office of The Judge Advocate General. In fact, we need look no further than this case for an example of a vigorous and capable defense in a difficult case by members of the Appellate Defense Division.

It is common knowledge, and the cases that have come before us show, that members of the Judge Advocate General Corps are called upon to serve in various capacities in administration of the courts-martial system. In one case, a Judge Advocate General Corps officer may be appointed trial counsel; in another, he may appear as defense counsel; in a third, he may act as the law officer; and in still another, he may be required to assist in the preparation of post-trial advice to the convening authority. On occasion, he may inadvertently perform incompatible duties in the same case. In such instances, his later action cannot stand. United States v Schuller, supra; United States v Coulter, 3 USCMA 657, 14 CMR 75. But mere change in duty assignment does not imply bias or prejudice. In other words, from the single fact that a Judge Advocate General Corps officer has represented accused for one, two, three, or more months as defense counsel, it cannot reasonably be argued that his association with accused so imbued him with a disposition in favor of accused as to disqualify him from appointment as a law officer in other cases. Similarly, the loyalty of a defense counsel is not suspect merely because he previously served as trial counsel in different and unrelated cases. Consequently, when we assess the relationship of Colonel Lee to the Government Appellate Division, we cannot close our eyes to this everyday, even necessary circumstance in the life of Judge Advocate General Corps officers. There is, therefore, nothing untoward in Colonel Lee's assignment to the board of review for this case and his performance of duties as Government counsel in other and altogether different cases. As a board of review member he did not review any of his own actions. See United States v Hightower, 5 USCMA 385, 18 CMR 9. Nor is it contended, or shown by the evidence, that he reviewed the action of persons who were so related to him as to justify application of the "appearance of evil" doctrine. As far as the record shows, Colonel Lee's relationship to Government counsel in this case was nothing more than the ordinary day-to-day as-

sociation of those assigned to the same duty.

Earlier, mention was made of a motion for reconsideration which the accused brought on before the board of review. The motion was denied. Appellate defense counsel contend the vote for denial does not conform to the Uniform Rules of Procedure for Proceedings In and Before Boards of Review, May 31, 1951.

The Uniform Code requires that a board of review be composed of not less than three qualified persons. Article 66(a), Uniform Code of Military Justice, 10 USC § 866. Rule I of the Uniform Rules provides that the "determination of any matter . . . will be according to the opinion of a majority." The rule has been construed to mean that "when a quorum sits" a decision of the board of ▮▮▮▮ review "need be only concurred in by a majority of the members participating." United States v Hangsleben, 8 USCMA 320, 24 CMR 130.

At the time this case was heard, the board of review was composed of Colonels Guimond, Baron, and Lee. Colonel Lee was relieved on October 17 while he was on leave and Colonel O'Connell was appointed in his stead. On October 18, Colonel Lee was reappointed to the board of review for certain cases in which he had participated and Colonel O'Connell was released from membership on the board of review for those cases. Later, Captain Moore replaced Colonel O'Connell, and he, in turn, was replaced by Colonel Rankin. The opinion in the case published on December 28, 1956, shows that the membership consisted of Colonels Guimond, Baron, and Lee. This showing corresponds to The Judge Advocate General's orders providing for the membership. In other words, for a designated number of cases the board of review was composed of Guimond, Baron, and Lee; for later cases, the membership was composed of Guimond, Baron, and Rankin. Both groups bore the designation Board of Review Number 1, but the composition of each was legally and factually different. It is not surprising, therefore, that when on January 31, 1957, the accused filed his motion for reconsideration with "Board of Review No. 1," Colonel Rankin refused to participate in the consideration of it because he did not "believe" he was a member of the board. According to The Judge Advocate General's orders only Guimond, Baron, and Lee had been constituted as the board of review for consideration of this case. Thus, the board of review was composed of three qualified officers at the time of the motion, as required by the Uniform Code. Colonel Lee had, in the meantimé, been detailed as Chief of the Board of Review Branch of the Government Appellate Division. He was serving as such at the time of the filing of the motion. Appellate defense counsel expressedly requested he disqualify himself from further participation in the case. He did. As a result, only two members considered the accused's motion. But under Rule I they constituted a quorum. Up to the point of consideration of the motion for reconsideration, the proceedings are unassailable. United States v Petroff-Tachomakoff, 5 USCMA 824, 19 CMR 120.

We turn to the decision itself. The Government places emphasis upon the difference between a decision to *grant* a motion or petition for reconsideration as distinguished from a decision to *deny* such motion. It maintains that the former, not the latter, requires a majority vote. In support of its position, it refers to the practice in the United States Supreme Court, and in many of the United States Courts of Appeals, which, in substance, provides that rehearing will not be granted unless a judge who concurred in the judgment desires it and a *majority of the court so determines.* See Rule 33, Rules of the United States Supreme Court. Neither Rule I, nor any other rule in the Uniform Rules, contains language similar to that in the rules of the several courts referred to by the Government. On the contrary, Rule I provides that the determination "of any matter" must be by a majority vote of the quorum. Appellate defense counsel are, therefore, correct in maintaining that, since only two members participated in the motion,

both had to agree if there was to be a majority vote. However, counsel are mistaken in concluding there was no agreement between the participating members.

Separate opinions were filed by the members of the board of review in connection with their action ▮▮▮▮▮ on the motion for reconsideration and on a petition for a new trial which also presented to it. Colonel Baron reviewed the "three particulars" of error assigned by appellate defense counsel in connection with the board of review's original decision. He concluded none justified reconsideration. In his separate opinion, Colonel Guimond said he was still not convinced the evidence was sufficient to sustain the findings of guilty. He went on to say that he "carefully examined the grounds" set out in the motion for reconsideration and he concurred in Colonel Baron's "views that such grounds are without merit." Both members of the board of review, therefore, were in agreement that the motion did not justify reconsideration. Colonel Guimond also indicated he would personally go beyond the grounds of the motion and grant reconsideration "on the Board of Review's own motion" in respect to the sufficiency of the evidence. In this position he was alone.

Colonel Guimond's opinion makes clear two separate matters were considered by him and Colonel Baron. One was the accused's motion, which was denied by both. As to that there was clearly a majority. The other matter was a proposal by him that the board of review itself reconsider the case on a ground different from that presented in the motion. For the board of review to act on its own motion, it had to have a majority; without a majority, it could not act. Consequently, Colonel Guimond was correct in observing that the board of review could not act when the two members constituting the quorum were in disagreement. It is apparent the motion for reconsideration presented by the accused was decided in accordance with Rule I of the Uniform Rules for the boards of review.

Moving to other actions taken by the majority of the board of review, the accused contends that two errors were committed which require remand of the case. The board of review majority wrote a sixteen-page opinion which considered only the sufficiency of the evidence to support the findings of guilty. The issue was determined against the accused. The majority then said: "We have considered the other assigned errors raised by appellate defense counsel and find them to be without merit." The failure of the majority to give specific reasons for each of the assigned errors is now asserted as error. The matter was first presented to the board in the motion for reconsideration and determined by it to be "without merit." We reach the same conclusion.

Certainly, it is preferable procedure for a board of review to indicate clearly the reasons for its action, ▮▮▮▮▮ especially when there are assignments of error which relate to material aspects of the trial. Canon 19, Canons of Judicial Ethics, American Bar Association; see also United States v Cooley, 6 BR 371, 377. We have referred to the matter in some of our opinions. See United States v Bunting, 6 USCMA 170, 19 CMR 296; United States v Duffy, 3 USCMA 20, 24, 11 CMR 20. But nothing in the Manual or the Uniform Rules of the boards of review requires a statement of reasons. Cf. United States v Fields, 9 USCMA 70, 25 CMR 332. Necessarily, the scope and the length of an opinion in a particular case rest in the sound discretion of the judicial body. See United States v Thomas, 6 USCMA 92, 99, 19 CMR 218; United States v Berry, 6 USCMA 638, 20 CMR 354.[5] We find no error in this action by the board of review.

---

[5] It has been said that the failure on the part of boards of review to answer assignments of error "has ever been a sore spot" for appellate defense counsel. But, adds the commentator, considering the state of the dockets of the boards of review, "it is surprising that they are able to write as many opinions as they do." Feld, Manual of Courts-Martial Practice and Appeal, § 114, footnote 7, page 124 (1957).

Accused's second complaint about the majority of the board of review is that it misapplied the burden of proof. Support for this contention is sought in the following terminal passage in the board of review's opinion:

". . . Superimposed on the above [a summary of the facts in evidence and the inferences that could be drawn therefrom], the accused's consciousness of guilt, the defense's failure to sustain the burden of going forward with evidence to explain away the circumstances that identify him with this crime, excludes every reasonable hypothesis except that of the accused's guilt."

Two fallacies are said to inhere in the disputed statement. First, counsel maintain that by speaking ■■■■■ of "superimposition," the board of review showed it gave "double weight" to the accused's alleged failure "to explain away" incriminating circumstances. In substance, the argument is as follows: If certain incriminating circumstances are not explained away they have logical value, but they do not gain extra or "super-logical" value by "adding to them the condition on which they exist." In our opinion, the quoted statement does not suggest that the board of review, consciously or unconsciously, gave double value to any set of incriminating circumstances; all that the board of review "superimposed on the above" was the accused's "consciousness of guilt," as it appeared from certain matters admitted in evidence. In other words, the summary of the evidence, plus the accused's consciousness of guilt, excluded, in the opinion of the majority of the board of review, every reasonable hypothesis except that of guilt.

Secondly, appellate defense counsel argue that the quotation shows the board of review shifted to ■■■■■ the accused the burden of proving his innocence. Cf. United States v Troutt, 8 USCMA 436, 24 CMR 246. We find no support in the opinion for this contention. The board of review took two full pages to discuss the relation between the rule that an accused "always has the right to remain silent and that no inference

of guilt shall be taken as a result thereof,"[6] and the frequently made statement on appellate review that when the evidence is incriminating and the accused fails to explain it he cannot "avoid the consequences of fair and reasonable inferences from proven facts." Bradford v United States, 129 F 2d 274, 278 (CA5th Cir) (1942).

The difference between the burden of proof on the ultimate issue and the burden of going forward with the evidence is well-recognized and well-established in the law. Agnew v United States, 165 US 36, 50, 41 L ed 624, 17 S Ct 235 (1897); United States v Greenwood, 6 USCMA 209, 213, 19 CMR 335; United States v Doyle, 3 USCMA 585, 594, 605, 14 CMR 3; United States v Reed, 9 CMR 269, 277. Attempts to explain the difference to a jury sometimes result in confusion. See United States v Doyle, supra, dissenting opinion of Chief Judge Quinn, page 601; United States v Hairston, 9 USCMA 554, 26 CMR 334. Among judges and lawyers, however, the words have plain meaning and a particular significance. Unlike the situation in the *Troutt* case, the board of review here raised no doubt as to the nature of the "burden" it was discussing; it talked explicitly of "the burden of going forward with the evidence." In its opinion, the accused did not assume that burden, and consequently the board of review drew on the permissible inferences of guilt which were suggested by the facts in evidence. There is here no shifting of the burden of proving guilt beyond a reasonable doubt. We find no error in the views expressed by the board of review.

Several related claims of error touching on the propriety of trial before the court-martial which heard the case are set out by the accused. The evidentiary background for consideration of these errors is substantial. It consists of the transcript of a press conference of a meeting of the Ryukyuan-American Community Relations Advisory Council and translations from the Japanese language press on Okinawa which appeared in a publication entitled "Daily Okinawan Press Summary" pre-

_____

[6] 18 USC § 3481.

pared for, and distributed in, the American military community on the Island. In the course of our discussion of the assignments of error, we will consider only so much of this material as is necessary to understand the issues.

For some time before the charges were referred to trial, Lieutenant (then Major) General Moore commanded the Ryukyus Command. He had general court-martial jurisdiction over the accused. However he was absent from the command when the charges were sent to trial; the actual reference was made by Brigadier General Johnson, who had assumed command. At the trial, defense counsel contended General Moore was disqualified from acting as convening authority. It was pointed out that General Johnson was the actual convening authority, but defense counsel maintained he was serving only temporarily. When General Moore returned to the jurisdiction he resumed command, and later acted as the reviewing authority. The latter circumstance, and the nature of defense counsel's claim of disqualification, give color, for the purpose of appellate review, to the defense objection, despite the fact that General Johnson, not General Moore, was the convening authority.

By appropriate order, the Commanding General of the Ryukyus Command also serves as Deputy Governor of the Ryukyu Islands, with administrative control over the civilian community. See United States v Biagini, 10 CMR 682, 691, 692. The accused contends the dual capacity gave the military commander a personal interest in the case, and thereby disqualified him as convening authority. Abstractly, the contention is untenable. Control over the civilian community provides no basis for an inference of "personal," as distinguished from "official," interest in the exercise of an official military act. Cf. United States v Keith, 3 USCMA 579, 13 CMR 135. But, says the defense, the accused's case was the "focal point" of Ryukyuan-American relations; hence, the result of the court-martial was important to the Commanding General in his capacity as Deputy Governor of the civilian community. Just how the importance of the case to civilian-military relations transformed the commander's concededly official responsibility in both areas to a "personal interest" in the outcome of the case is not made clear. We get the impression that the accused's allegation of error is really that command control was exercised by General Moore, rather than that he was precluded from acting in the case because he was an accuser. Cf. United States v Keith, supra; United States v Marsh, 3 USCMA 48, 11 CMR 48.[7] In any event, we have examined both aspects of General Moore's connection with the case and we find no merit in either.

The dead child was found on the morning of September 4. On September 6 the accused was taken into custody as a suspect, and on September 9 he was served with the charges. In the period that followed, the incident produced a great deal of comment in the civilian community. Indeed the matter seems to have become the rally point for some local organizations—for different reasons. A summary of the situation, and of the use made of the case by certain groups, appears in the following extract from the newspaper, *Okinawa Shimbun*, which was digested in the Daily Okinawan Press Summary for Friday, September 16, 1955:

"The child rape cases have come to be taken up, not as simple criminal

---

[7] Three separate statements regarding General Moore's relation to the case have been made by the defense. In his request for counsel before the board of review, the accused said he did not get a fair trial because General Moore and Colonel Gaynor, the Staff Judge Advocate, "made statements to the press that I believe had a lot of influence" on the court-martial. In a "Petition" filed in this Court, the accused complains again about the "influence of command" through statements to the press. Trial defense counsel's appellate brief refers to the same subject, but as evidence of error in the denial of a motion for a change of venue. Appellate defense counsel restated the issue in its present form.

cases, but as an important problem having direct bearing on the basic human right. We dare say that every Okinawan is burning with indignation. Public opinion blame the colonialist American administrative policy as the cause of the incidents, bitterly criticizing them and strongly requesting that an appeal be made to the world from the standpoint of protecting the basic human right, and urging a drastic self-reflection of the administrative authorities.

• • • • •

"Since the problem is of great importance, it is considered that each group will take countermeasures from their respective standpoint, but they should delve deep into the problem and request a drastic solution of the cases. In order to do so, it would be desirable to seek adjustment and unification of the problem, as soon as possible. On scanning through the declarations and requests of each group, we realize that every one of them are to the point, and yet, the focal point of their requests appear to differ from one another."

General Moore called a special meeting of the Ryukyuan-American Community Relations Advisory Council "because of developments resulting from the recent rape cases." Apparently there were four such charges pending against "one Ryukyuan and two Americans." One of the objectives of the Council was to study "problems affecting the community and the United States Forces." Included among the civilian representatives were the civilian Chief Executive, the Speaker of the Legislature, the Chief Justice of the Ryukyu Islands, the President of the University of the Ryukyus, and the President and Managing Editors of the civilian newspapers. The meeting was held on September 16, 1955.

In his opening remarks, General Moore stated his abhorrence of the criminal acts and expressed his "deep sympathy" toward the families of the victims. The tenor of his comments on the situation which prompted the meeting appears clearly in the excerpts that follow:

"Although one of your countrymen is also involved, we fully understand the feeling of horror and indignation on the part of the Ryukyuan people. Partly because of misunderstanding or ignorance and partly because of agitation, the matter has gotten far beyond just that, however, and has reached the point where a bad situation is being made worse. There have been a number of ill-advised remarks made which I feel are unfortunate.

"First of all, I think I should tell you that the moral standards of the American people are certainly as high as those of the Ryukyuans and acts of this nature are not condoned by Americans any more than they are by Ryukyuans. To infer otherwise, I feel, is an insult to the American people.

• • • • •

"In our legal procedures, cases first have to be investigated by the police who examine all the evidence to determine who should be tried and for what crime. This often takes some time because they may have to do laboratory tests and other time-consuming work in order to develop the evidence. The case then has to be investigated by an impartial officer, reviewed by the Staff Judge Advocate and brought to the convening authority to determine whether or not it will be tried and, if so, what court will try it. The cases are always tried in open court and sentences are announced publicly. The only time when that might not be the case is when the evidence affects the national security. That would not be the case in these instances. To my knowledge, there never has been an attempt at whitewashing or covering up of any case. They are all tried impartially and the findings and sentence are based on the evidence in each instance. The rights of the accused to a fair trial are fully provided for but no commander can maintain discipline in his organization if he countenances violations of the law at any time.

"Now, although we have by Treaty

granted to some friendly sovereign powers the right to try military personnel for violations of local laws, it would hardly be proper to grant this right in the Ryukyu Islands, since the United States exercises the power of sovereignty here. Even in the United States, servicemen aren't turned over to the civilian authorities unless the military authorities so choose.

．　．　．　．　．

"Now, I want you to know that the military commanders are very much upset about the situation which exists on Okinawa right now. We have met together to discuss the problem and to see what should and could be done. One thing we considered is placing the island off limits for all military personnel. We also considered having curfew at dark each night. These are the things which apparently some of your articles and petitions have asked for.

．　．　．　．　．

"We in the military are talking this over with our men, explaining the situation and the feeling of the local populace. We are pointing out that if a serviceman is charged with committing any offense against a Ryukyuan at this time, it will be whipped up out of all proportion. The military police patrols are being increased and we have asked the local Councils of post commanders and mayors to get together and talk this matter over to determine how things can be improved in their areas.

"None of these actions will do any good, however, if certain groups continue to drum up agitation. It seems to me that we should sit down calmly and maturely and think this thing out together—try to solve the problem rather than making it worse."

Some of the civilian responses to General Moore's remarks merit mention:

*Mr. Higa* (Chief Executive): " . . . It is quite unfortunate both for the United States and Ryukyuan sides that these incidents took place; however, the objectives of this meeting and of all Okinawans having

meetings, should not lie in taking advantage of these instances to accomplish something else but in the re-examination of these matters to devise a means of preventing recurrences of incidents of this nature in the future. I believe that the political alliance of these instances has stirred up more agitation, and it has not contributed at all toward solving or finding a solution for these incidents. . . .

"To tell the truth, I was rather shocked to hear that the Deputy Governor had proposed placing the entire island off limits. It is obvious to me that the off limits idea has to be a last resort and the enforcement of this off limits idea will bring destruction to the economic life of the Okinawans, thereby placing qualms to the better relations of these two groups. I believe that our objectives should lie in the prevention of similar instances in the future and also to wipe out these elements who always appeal to the public through agitation."

*Mr. Ohama* (Speaker of the Legislature): " . . . I have never had any direct contact with military trials but I have read and heard in the past that the trials for crimes involving Ryukyuans and Americans may take place but the results thereof remain a mystery. Now I am glad to hear that the Deputy Governor said that the trials and sentences will be made public. I do know that crimes connected with military will be tried by military courts. The statement that these trials will be open trials and that the sentences will be made public has pacified my feelings and no doubt a similar reaction can be expected from many other people."

*Mr. Nakamatsu* (Chief Justice): "I wholeheartedly concur with General Moore's statement that trials should be held in courts and not in newspapers. . . . Be it American or be it Okinawan, his own judges should carry out the trials in the courts. As a judge, I do not have the slightest doubt that justice will be done by all courts."

*Mrs. Takeno* (President, Okinawa

Womens Association): ". . . If this act [the crime charged] was committed by an Okinawan, the people would probably surround his house and stone it and indignation will reach its peak and they will probably lynch this person but because of the fact that it was committed by an American, nothing has taken place, so far. . . . This is the way the Okinawan women feel about it and I am sure that they are not trying to make a political issue out of it. . . . There must be many reasons which cause these incidents but to me the main reason is because Okinawans do not have the power of resistance. I feel that unless an effective means is devised to prevent future occurrences, I believe it will be very harmful to the Okinawan and Ryukyuan as well. My request is that something be done to see that there are no more of these instances in the future."

Mr. Tamaki (Managing Editor, Ryukyu Shimbun): " . . . I am told, and I am sure it is true, that no rapes are committed in the United States. In other words, the rapes committed by American servicemen are always in areas other than the United States, such as Okinawa. . . . We also cannot ignore the political implication of these incidents. . . . We are not at war with anyone. Yet crimes of inhumanity are taking place today in Okinawa. . . . the basic cause of these incidents is the lack of regard for Okinawans on the part of.U. S. servicemen. If this attitude remains unchanged, then nothing can be accomplished by the military toward prevention of similar incidents in the future. I am not a politician or a law-maker but I cannot help hearing people talking about Americans."

In summary, General Moore said he hoped this "exchange of thoughts" had helped "to clear the air" and provide better understanding. He assured the Council the military would do everything possible to prevent similar incidents and that the accused in the pending cases would be given "a fair and impartial trial." Referring to Mrs. Takeno's remark about lynching, he added: "I am sure that the same will be the case with respect to the Ryukyuan." Five days after the Council meeting, General Moore addressed a staff conference at his headquarters. He mentioned the Council meeting. He said:

"We brought up the point that we have gone far enough in deploring these acts. I . . . indicated . . . directly and indirectly that we have had just about enough. However, there are organizations who got carried away with their own oratory and in some cases are getting out of hand. The righteous indignation, as I have indicated before, has carried them away to the extent of mixing up with civil rights, human liberties, reversion to Japan. I think it has quieted down, but any incident will be magnified as I have mentioned before. . . . Get your soldiers to understand the situation. Most of them, almost all of them, will play ball with us. Let them know they have done a thing that hurts us. Show these things up and make sure proper steps have been taken in the punishment and apprise your men of the situation, what the situation is."

A reading of the transcripts of the Council meeting and the staff conference leaves the conviction that General Moore was not panicked by the civilian community's outrage at the crimes. He shared their abhorrence, as would any normal person. But plainly his abhorrence of the crimes did not result in a determination to convict the accused regardless of the evidence. Rather he insisted that all accused, including the Ryukyuan charged with rape, would be given "a fair and impartial trial." His aside to Mrs. Takeno's comment on lynching and his explanation of the impartial procedures of a court-martial, measure his disagreement with the use of improper means of law enforcement.

The four instances of rape were the first the Islands had experience in more than a decade of American military administration. The record shows that General Moore was concerned with the problems highlighted by these crimes.

761

It shows that he considered various ways of preventing similar incidents and of furthering understanding between Americans and Okinawans. But it does not show he was prejudiced against the accused. It does not show he intended to influence the court-martial which would try the accused or that he desired a conviction or the imposition of a particular punishment as a means of stilling the civilian community's outcry. There is, therefore, no basis for the accused's assertion that, because of his position as Deputy Governor and his statements before his staff and the Advisory Council, General Moore was disqualified from acting in the case. And there is no basis to support the accused's contention that General Moore asserted command influence upon the court-martial. United States v Carter, 9 USCMA 108, 25 CMR 370; cf. United States v Shepherd, 9 USCMA 90, 25 CMR 352, opinions by Judge Latimer and Judge Ferguson.

Part of the claim of command influence rests upon the transcript of a press interview held by Colonel Gaynor, the Staff Judge Advocate of the command, and Lieutenant Colonel Rollman, Staff Judge Advocate of the Air Force command. The interview was held on September 16 just before the Council meeting. The purpose of the interview was "to give a brief explanation of how military justice operates." Colonel Gaynor outlined the entire procedure. Colonel Rollman pointed out that the procedure applied whether the offense was committed against an American or against an Okinawan; he also observed that military trials were "in most cases, open." A variety of questions were asked by the press representatives. We have read the transcript of the interview and find not the slightest indication that command influence upon a court-martial was considered proper or that it was contemplated in this case. On the contrary, Colonel Gaynor emphasized that there must be "perfect fairness" in the trial of a court-martial case. There was indeed some discussion of the instant case. The questions concerned the time of probable hearing and whether, if convicted, the accused

would remain on the Islands pending appellate review. Other questions were foreclosed by Captain Upton, the Public Information Officer, with the remark that "This has been an explanation of the system of military justice and procedure. Let's not try the case in the newspaper before the court gets a chance." Mr. Kinjo of the *Ryukyu Shimpo* indicated they would "make public" what they had heard "about this procedure." The interview was concluded. The transcript reflects nothing to support the contention that the interview was used as a means of influencing the court-martial which tried the case or that it had that effect.

A third aspect of the claim of prejudice based on the civilian community's attitudes is framed as an appeal from the law officer's ruling denying a motion for a change of venue. At the trial, defense counsel moved for a change of venue from the Ryukyus to some other command on the ground that the native population was "aroused to . . . hatred and frenzy." The exhibits already mentioned were offered in support of the motion. The significance of the exhibits was well-described by defense counsel in his argument:

". . . Reading the press summaries, one gets the feeling that there was not much tension prevalent until it was learned that the accused was an American serviceman. From that time on the press worked themselves into a frenzy of hatred. They have implied that Ryukyuan-American friendship hinged upon the conviction of Sgt. Hurt. . . . At the same time they implied that the Deputy Governor should assume responsibility if it was determined that the accused was an American serviceman."

To various parts of the civilian population, the case represented a vehicle for presenting a demand for some kind of community relief. The relief demanded ranged from what some called the American "colonial policy" to more police protection for the village of Perry-Ku. It clearly appears that whatever tension was created in the civilian

community was not directed against the accused but against American administration of the Islands. This is not the kind of tension that demanded conviction of the accused by an American court as the sine qua non for its release. Be that as it may, the attitudes of the civilian populace did not affect the court-martial. Several times in the course of his argument defense counsel admitted that the court members "at this time" might not be aware of the feelings of the native population. (All members of the court had said on the voir dire that they would not be influenced by the possible political significance of the case.) Yet, he insisted there was a "potentiality" for violence and "extreme pressure" on the court members. This was so, he said, because a substantial number of Okinawans were employed in the military community in jobs which would bring them in contact with the court members.

Trial counsel maintained that the prospect of a mob was sheer "speculation." He argued that the civilian tensions referred to by defense counsel existed more than two months ago and that the latest press summary quoted the *Okinawa Times* as saying it was a "matter of joy" that the trial of another sensational case "was conducted openly"; and that such open trial gave "the masses an impression of a just and impartial justice." In referring to the accused's case, the *Times* observed it was "really fortunate that public opinion was quelled without further outbursts." Trial counsel also noted for the record that the spectators obeyed the order of the law officer to leave the courtroom during the hearing on the motion, without protest or the need for "intervention" by the "orderlies." On this showing, the law officer did not abuse his discretion in denying the motion for a change of venue and the alternate motion requesting the appointment of members from other commands. United States v Gravitt, 5 USCMA 249, 17 CMR 249; see also United States v Carter, 9 USCMA 108, 25 CMR 370. The foregoing evidence, coupled with the voir dire examination, also shows that the court members were not influenced by the newspaper reports of the case. Reining v United States, 167 F 2d 362 (CA 5th Cir) (1948).

We now consider the trial itself and the question of the sufficiency of the evidence. No one saw the accused commit the crimes; and the accused did not confess. The evidence is circumstantial, but circumstantial evidence can establish guilt beyond a reasonable doubt as effectively as the testimony of eyewitnesses. United States v Walker, 6 USCMA 158, 19 CMR 284.

That Yumiko Nagayama was raped and killed is undisputed. The identity of the person who committed the acts was the basic issue at the trial, and it is the central point on this appeal.

After an examination into his competency, Mitsuru Yamashiro, an eight and one-half-year-old Okinawan boy, was allowed to testify. He said that on September 3, 1955, he was playing with another child on the main road in the village of Ishikawa. It was "completely dark." Yumiko was about ten feet away. She wore a white dress. A car, with its lights on, drove past. It turned around and stopped at a point about twelve feet from him (and apparently near Yumiko).[8] Mitsuru said that the time was about 7:00 p.m.[9] A single American was in the car. He smoked a cigarette; then he went to where the girl was "and carried her away." The girl cried out "kachan" (mother). Mitsuru described the American as wearing a "white" shirt and pants of a "gray" color "with black stripes running down." He identified a car outside the window of the courtroom

---

[8] The distance was estimated by reference to an object in the courtroom.

[9] It was shown that the sun set at 6:47 p.m. and the twilight period that followed lasted 23 minutes. A defense witness testified that the moon was out and there was visibility for about 100 yards. The victim's mother testified she last saw her daughter at 7:00 o'clock. The court-martial therefore could find that the time was somewhat later than estimated by Mitsuru.

as the car he saw on September 3.[10] On cross-examination defense counsel asked Mitsuru to describe the seat covers. He said: "I seen it like it was white." He described the fenders as "something" like the color of the interpreter's shirt which was noted to be "green."

From about 4:30 or 5:00 p.m., the accused was drinking beer in the New Paradise Cafe in Ishikawa. He had left his gun site between 12:00 and 1:00 p.m. with Specialist Senegal. The latter testified that the accused was then wearing a white polo shirt with a collar and blue checksd trousers. He identified Prosecution Exhibit 3 as the trousers.

Kishimoto Kiyofumi testified that he lived in a house on Highway 16 about one thousand meters from Kadena Circle. Highway 16 joins Highway 13 which leads from Ishikawa, and the Circle is about nine and one-half miles from that village. "[B]etween seven-thirty and eight o'clock," he was in front yard of his house which was about twelve meters from the road. He heard the "cries" of a "child's voice" coming from a passing car headed toward the Circle. The car was an "old type" and the engine "sounded like it was an old car." He did not see the lower part of the car but "the top was grayish color."[11]

About 7:30 a.m. on September 4, the body of Yumiko was discovered in a quarry by a farmer. He went to call others. While he was away from the site, Airmen Conrath and Little, who were searching the area for articles reported stolen from their unit during the night, came upon the body. The body was on its back with the legs spread. They estimated the time as between 8:00 and 8:15 a.m. Conrad "looked . . . fairly closely" at the body and noticed bruises on the left side, which faced the road, and on the arm of the child. They started to return to their unit to call the police. About fifteen to twenty yards away, Little noticed a tire track. He looked at the track for approximately thirty seconds. It appeared to be "very clear." Since he was "no expert" he could not say whether it was a fresh track, but it was his "impression" that it was "comparatively fresh." Asked by defense counsel if he remembered "generally what the pattern was," he said he could not. However, he did recall a discussion with defense counsel in which he had said the inner treads of the tire track were different from the outside. Now, however, he "couldn't make a statement like that because . . . [he was] not sure." Nevertheless, at defense counsel's urging, he drew a picture; it showed four lines, two wavy lines bracketing two straight lines. He also drew a picture of the treads on the tires of a car in the stockade impound-nig lot which had been represented to him as belonging to the accused and which was then outside the courtroom

---

[10] Appellate defense counsel characterizes the identification as "one of the most flagrantly leading identifications in the annals of justice" because there was only *one* car outside the window. It is obvious that trial counsel could not conveniently bring the vehicle into the courtroom. Since the physical conditions permitted, he could properly point out the car to the witness just as he might hand him a weapon found on the scene of a crime. He could then ask the witness if he recognized it or if he had seen it previously. The car was shown to belong to the accused. It was also shown that the accused was driving the car in the vicinity about the time of Yumiko's abduction. However, the accused bitterly

assailed Mitsuru's credibility. We will consider the attack later in the opinion.

[11] On October 14, 1955, the witness gave the investigating officer a statement. In it, he said that "it was pretty dark so I could not tell the color of the car but it sounded like it was a junk because it made a lot of noise." The statement was introduced to impeach the witness. In rebuttal, a civilian police officer testified that on September 6, Kiyofumi had told him "he noticed the color of the car as being grayish and of dull finish." It is also to be noted that later a defense witness testified the moon was out. Although there was an overcast, he said visibility in the moonlight was about a hundred yards.

764

window. The picture showed four wavy lines.

On returning to their unit site, Conrath called the Air Police. When, after about twenty minutes, no one came, he and Little "flagged" a passing Military Police vehicle. They proceeded to Kadena village, picked up two civilian policemen, and returned to the quarry. Little approached within five feet of the body. He had a "good look," but he did not recall "too much about it." Led by defense counsel, he said the "first thing" he observed was that the skin of the body "had a sort of blue tinge to it" over all "the visible parts." At 9:45 a.m., Captain J. A. Burnett, Chief of the Investigating Branch, Rycom Provost Marshal's Office, arrived on the scene.[12]

Captain Burnett described the body. He said that post-mortem lividity (settling of the blood) in the back areas of the body were "pronounced and visible" in the left arm, the back part of the left side of the back, and in the buttocks and heels. Lividity gives "a purplish color" to the skin. There were bruises in the chest area and on the inner part of the thighs and legs. The top of the body was "a pasty yellowish color" but it was "purple" where the bruises were noticeable. The body was "rigid and did not tend to bend." It was picked up in the position it was in, and removed. Later it was refrigerated.

Before going on with an account of the evidence, it is appropriate to interpolate some comments on the issue made by the accused in the difference in testimony between Airman Little and Captain Burnett. The difference concerns the over-all color of the child's body at the time of discovery. At the trial, defense counsel contended there was a substantial difference and that the difference affected the opinion of the prosecution's medical witness as to the time of death. To support the argument, which is repeated on this appeal, he presented certain hypothetical questions based upon the purple appearance of a body which lies first in one position and is then reversed to the opposite position, in other words, from face down to face up.

In our opinion, the court-martial could find there was no material difference in the testimony. According to Conrath's statement, Little viewed the body from the left side. On that side, post-mortem lividity was visible on the left arm and left side of the back to a "pronounced" degree. Also the photograph of the child which was admitted in evidence shows that her dress was torn at the top left, leaving her shoulder and part of the chest exposed. This part of the body was also visible to Little. Moreover, he could readily see the inner thighs and heels because of the position of the body. Captain Burnett testified there were bruises in both places and these were purplish in color. The court-martial could conclude that Little's testimony that the body had a "sort of blue tinge" was materially consistent with the Captain's. In evaluating the medical evidence as to the time of death, it could give substantial weight to the testimony of the doctor who performed the autopsy, and little or no weight to the answers to the hypothetical questions based upon the assumption that when "the body was found, the front portion . . . was definitely purplish all over."

Returning to consideration of the evidence, the prosecution called Dr. Nagahama Shintoku, a medical doctor. His qualifications include specialized study in pathology at Niigata University and the award to him of a certificate "for an autopsy physician." He testified about an autopsy he performed on the body of Yumiko on September 4, and about a later examination of a vaginal section. Using notes he made on each occasion, he described the con-

---

[12] Little testified he first saw the body "a little bit after 8:00." Conrath placed the time between 8:00 and 8:15 a.m. Considering the events between their first and second visit to the quarry, the court-martial could find that Captain Burnett was on the scene within an hour of the time Little and Conrath returned and saw the body for the second time.

ditions he found. He observed rigor mortis in the lower extremities; it was an "ordinary type." He found bluish purple "dead spots" (post-mortem lividity) on the back of the neck, back, waist, hip, and back of the leg. On the neck were sporadic depressed marks. Both sides of the chest had many bleeding points associated with "excoriation" (removal of the epithelium). Bleeding points were also observed on the inside of the thighs, the waist, and the hip. Other wounds and lacerations were found in the child's genital organs. These were described. There were adult finger marks on the chest indicating the administration of artificial respiration. As a result of his findings, and the fact that pubic hairs were found inside the victim's vaginal area, the doctor concluded there had been penetration by a male organ. Since there were numerous signs of bleeding, it was his opinion intercourse had taken place before death. Death itself was caused by suffocation, induced by pressure on the neck and chest. Based upon the "extent of post-mortem changes . . . the place where . . . the autopsy [was performed], the climate, the decomposition of the organs and also from . . . [his] experience" Dr. Shintoku estimated that, from 6:00 o'clock on September 4th, death occurred about twenty hours before— in other words, about 10:00 p.m. on September 3. He would allow, however, for a variation of one or two hours either way. Later, when recalled by the court, he said death could have occurred at 9:00 p.m. on September 3 and he could "not say definitely" that it took place at 8:00 p.m.

Defense counsel examined Dr. Shintoku at length on the factors he considered in estimating the time of death. These are mentioned above. In examining Yumiko, the doctor concluded rigor mortis was present in that there was "stiffness . . . slightly in the legs, ankles." In his opinion, the condition was "in the status of dissolving." The defense attempted to discredit his testimony in several particulars. One of these was the interval of time between the completion of the process of rigor mortis and its dissolution. Dr. Shintoku said that as soon as one phase was completed the other began. However, later in the trial Dr. Naoki Kuwashima, Professor at the Yokohama University School of Medicine, testified that the time between completion of rigor mortis and the beginning of dissolution was twelve to twenty-four hours. On that basis death would not have taken place before 9:00 a.m. on September 3.[13] Dr. Kuwashima's estimate obviously does not correspond with the other known facts in the case. Still it might lessen the value of Dr. Shintoku's estimate, as stressed by the accused, if it were not that other evidence favors Dr. Shintoku's testimony.

Yumiko's mother testified that the child had eaten at about 6 o'clock on the evening of September 3. Dr. Shintoku found no food in the stomach. He testified that in the digestive process it takes two to four hours for the stomach to empty. He also said that digestion stops at death. Consequently, the court-martial could find that death occurred between 8:00 and 10:00 p.m. on Saturday, September 3. That period corresponds with Dr. Shintoku's estimate of the time of death on the basis of the other factors considered by him.

Turning to the evidence implicating the accused, we have already noted that Mitsuru identified the accused's car as the vehicle in which Yumiko was carried away. For the present, we pass over that damaging identification to consider the other identifying facts. Mitsuru said the person who abducted Yumiko was an American who wore a "white" shirt and gray trousers "with black stripes running down." When Specialist Senegal left the battery area with the accused, the latter according to Senegal was wearing "blue checked trousers and a white polo shirt with a

---

[13] This estimate is based upon thirteen hours for completion of rigor mortis, on which the doctors were generally agreed; twelve hours for the interval before dissolution; and eight hours for the time during which dissolution had progressed, as testified to by Dr. Shintoku.

collar." In the car on the front seat was a "grayish Hawaiian" shirt. Prosecution Exhibit 3 was identified as the trousers and Prosecution Exhibit 4 was the Hawaiian shirt. The latter according to Senegal, was apparently worn by the accused "when he came back to the section." Senegal did not see any underwear in the car nor did he make any mention of a pair of khakis.

At about 2:00 or 2:30 p.m. the accused appeared at the Ichiraku Cafe in the village of Yaka, and asked for beer. Miss Yoshiko Kamemura, a waitress who knew the accused, testified he wore a white shirt with a collar and trousers which were "gray or mouse-colored and checkered." She identified Prosecution Exhibit 3 as the trousers. The accused remained in the cafe drinking beer and smoking Lucky Strike cigarettes until 4:00 or 4:30 p.m. The accused departed in his car which was described as "green and the top was white." He was headed toward Ishikawa.

Kiyoko Tamashiro testified she was a waitress in the New Paradise Cafe in Ishikawa. She knew the accused. She said the accused came into the cafe between 4:00 and 5:00 o'clock. He was wearing a short-sleeved "light color, not quite blue or gray" shirt; his pants were "light color and checkered, small." She identified Prosecution Exhibit 3 as the pants. The accused and three others, including Tamashiro, consumed thirteen bottles of beer which were paid for by the accused. During the evening the accused smoked Lucky Strike cigarettes. He asked for the time and was told it was 7:30 p.m. He started to leave "in a hurry" but discovered he had lost his keys. Corporal D. C. Stewart, a Marine who had been drinking with the accused, joined together the wires of the ignition switch. The accused left about ten or fifteen minutes after he had asked for the time, or about 7:40 or 7:45 p.m. His car made a "loud sound" which was "like an old second-hand" vehicle.

Nothing directly is known of the accused's movements after he left the New Paradise Cafe. We have the tes-timony of Mitsuru identifying his car, and that of Kiyofumi, who testified about a child's voice coming from an "old type" car with an engine that sounded like "an old car."[14] There is testimony about a car or cars being at various times in the general vicinity where the body was found. Appellate defense counsel contend that this testimony shows conclusively the accused's car was not in the area. The contention rests upon the "loud noise" purportedly made by the accused's car. The testimony of the witnesses not only contradicts the theory but provides connecting links to the accused.

Higa Fumio, the owner of the New Paradise Cafe, testified for the defense. He said that the engine of the accused's car was "not working smoothly" and "there was no muffler." The car, he said, made a noise which could be heard "a distance of approximately hundred fifty meters." In his estimation, the sound was louder than when "the engine of a truck is accelerated high." Corporal Senegal said that the car had "straight pipes" and it made "a lot of noise." On the other hand Yoshiko, who knew the accused, had heard him arrive at and depart from the Ichiraku Cafe, and who had ridden with him in the car, testified that "occasionally the sound is loud, sometimes it is soft." Miyaguni Tatsuo, a defense witness, said that running at "full speed" the sound of the accused's car was "slightly lower than the sound of a GMC" (an Army truck).

Four Okinawans and two Americans, who had been on guard duty in the general area, testified on their observations during their respective tours of duty on the night of September 3. Each said he saw or heard only one car near his post, and in no case was the sound of the car loud or like that of a GMC. There are substantial differences in time and, in some respects, place in their testimony. For example, the guards at posts about 450 feet apart testified to seeing a vehicle between 9:30 p.m. and 10:00 p.m. and between 10:30 p.m. and 11:00 p.m., respectively.

---

[14] The accused's car is described as a 1948 Ford with a white top and hood and green fenders and body. It has a rounded back.

767

It is apparent that if their testimony is taken literally, the guards must have seen different cars. If the times are not reconciled, the court-martial could conclude that accused's car did not make a noise loud enough to attract the attention of the guards. If the time estimates are reconciled, the testimony of at least three witnesses can logically be connected. A description of the general area and reference to other items of physical evidence will serve to make clear the basis for reconciliation.

On September 13 a pair of white shorts were found near a quarry less than a mile south of the quarry in which the body was discovered. It had blood across the front. Dr. Kuwashima identified the blood as type A, the same as that of the victim. Also found in the area was a cigarette package which had on it a latent fingerprint. The print was not that of the accused, and it was not otherwise identified. In the same area were also some yen notes.

In referring to Kiyofumi's testimony, we pointed out that Highway 16 from Ishikawa runs to Kadena Circle. At the opposite part of the Circle a road runs west to the beach. At that point it curves and runs south for about 1 and 1/2 miles; then it curves almost due east and connects with Highway 1. This is the coastal road. Between the top and bottom curves of the coastal road, several east and west roads also join it to Highway 1. One of the east-west roads is about one hundred feet below the north quarry in which the body was found. The posts of the Okinawan guards who testified for the defense are located in what is called the tank farm (a group of storage tanks) near the south quarry. Roughly the area and the location of the guard posts are as follows:

EAST

CHINA

SEA

Kadena
Circle

16

Quarry
A

B-2 gun site

B.

1

C.

.94

N

.96

.93

S

.91

.92

D

Quarry

SCALE:
1 inch =
Approx.
900 feet

A: Yumiko's body
B. Yumiko's geta
(slippers)
C: Yumiko's panties
D: Area in which a
pair of male shorts
covered with Type A
blood, yet notes
and a Lucky Strike
cigarette package
were found on
September 13.

Enokawa Seian testified that he was a security guard. He arrived in the storage tank area at about 9:00 p.m. At a time he estimated to be about 9:00 p.m. and 9:30 p.m., he set out to check the guard areas for which he was responsible. Parenthetically, we note he said he remained in the tank area for thirty minutes; consequently, the later estimate is more probable. He entered the coastal road from the southernmost east-west road and headed north. About midway between the B-2 position and the second east-west road, he saw a car parked near the beach. It was facing south. As he approached, a man "got up from the seat and grabbed hold of the steering wheel." The car was "old" and had a "rounded" back. Prosecution Exhibit 8 shows that the accused's car has this type of back. The witness thought the side of the car was "black" but he could not distinguish between a dark color and black. The person in the car was an American; he wore a short sleeve white shirt with a collar. The spot at which the car was parked was about three hundred feet south of Yumiko's body, and about three hundred feet north of the place where her slippers were found.

Post 93 is about one hundred feet east of the coastal road. It was patrolled by Tatsuo. He testified for the defense. He saw a car in front of a house near his post. The car made an "ordinary sound" like a taxi; it remained at the house for about thirty minutes and departed. He could not see the color of the vehicle. He placed the time at about 9:00 p.m. From the time and circumstances, the court-martial could conclude that this incident had no connection with the crimes.

Komei Matsuda was on post 91. This is about one hundred feet from the coastal road and three hundred feet north of the east-west road at the south quarry.[15] He purportedly saw only one car during his tour of guard. He was not certain of the time but he thought it was between 10:30 and 11:00 p.m. The circumstances under which he saw the vehicle are not clear. At one point he traced the path of the car along the east-west road to the spot marked "D" on the above diagram. But he also testified he did not see the vehicle "come in"; he saw only the lights when the car "started off." He indicated the vehicle was stopped at point "D" without lights; lights went on, the car started up, went out the coastal road, continued down that road to a construction shack (about six hundred feet away), reversed, came back to the east-west road, turned into it, and went on to Highway I road. He did not hear the car so "it did not make a loud noise." The day before he testified, he had heard the accused's car in operation. It seemed to be operated at a "higher than normal speed" and made a very loud noise "similar" to a GMC. If the car he saw had made that sound, he would have heard it.

Nohara Keiman was on post 92. Between 9:30 and 10:00 p.m. he saw a car move to the side of the east-west road and stop at Point "D." The lights went out, then they went on again, and the car proceeded to the coastal road. He heard no loud noise from the car. The day before testifying he had heard the accused's car in operation; it made a sound "similar" to a GMC. If an auto making such noise had passed his post, he would have heard it.

The defense emphasizes that each of the guards saw only one car and that car did not make a "loud ▅▅▅▅▅ noise." He argues from these circumstances that the vehicle could not have been the accused's. The argument disregards the time difference. To that extent it is valid; and it is a conclusion which the court-martial could reasonably reach.[16] Elimination of the time difference, how-

[15] The witness estimated the latter distance as two hundred fifty meters (about eight hundred feet) but the markings on Prosecution Exhibit 1 indicate the distance is closer to three hundred feet.

[16] The actions of the car seen by Keiman and Matsuda are substantially the

ever, serves to identify the accused more closely with the crime.

Recalling Seian's testimony, we start with the car parked on the coastal road, facing south. The time was probably 9:30 p.m. His description of the driver of the car corresponds in two respects to that provided by Mitsuru of the person who abducted Yumiko, namely, that he was an American and that he wore a white short sleeve shirt with a collar. The car he drove was "old," "broken down," and had a "rounded" back. The description fits the accused's car. From the driver's action the court-martial could conclude he was startled by the appearance of Seian's vehicle and that he left immediately. Since the car faced south, it is reasonably inferable it proceeded in that direction. That brings us to the testimony of Keiman and Matsuda. The latter did not see it "come in," but he saw a car on the east-west road at about Point "D" on the diagram. And the former also saw a car which turned off its lights at the same place; his estimate of the time corresponds to that of Seian. Since both witnesses reported seeing no other car, it could be inferred this vehicle was the one seen by Seian. From the stealthy movement and the place where the car stopped, the court-martial could reasonably find that the occupant discarded the blood-stained shorts and left.

The accused appeared at Yoshiko's place later in the evening. She was "entertaining" a "customer" in her room so she did not see him immediately. She "guessed" he arrived between 11:30 and midnight. He wore the same trousers he had on in the afternoon, but he now wore a long-sleeved shirt which was "artificial silk white with pattern in it." The accused appeared to be "in control of his senses," yet he seemed "wobbly" and he *told* her he was drunk. Yoshiko took the accused to the beach so as not to "bother the other customers" and to sober him up. Ten or fifteen minutes later they returned to her room. The accused went to bed with his clothes on.

About 6:30 or 7:00 the next morning, Yoshiko awakened the accused. She desired her usual fee so she undressed the accused and attempted to stir his passion. She did not succeed. She noticed then that his trousers were stained on both sides between the knees and the hips. The stain was the color of a cover of a volume of the Court-Martial Reports (red). It appeared to be "brushed on lightly." She asked the accused what the stain was, but he did not reply. As the accused prepared to don his trousers, it was suggested that he put on, instead, the pair of khakis which had been seen in his car and that the soiled ones would be washed. He agreed. The trousers were hung on a wire which "runs across the hallway." The accused, wearing a pair of white shorts, went for a walk on the beach with Yoshiko. On returning to the house, he told her to change clothes and he would take her to breakfast. While Yoshiko was preparing herself, the accused moved his car near the kitchen. On coming out of the house, Yoshiko saw him in the back of the car with a pan of water. He appeared to be wiping something. She asked what he was doing; he answered, "Nothing." She and another girl got into the car and the accused drove to a restaurant in Kadena. Leaving the restaurant, they drove by the quarry area. A jeep was parked at the quarry. The accused drove past and returned to Yoshiko's home.

On Tuesday, September 6, the accused's trousers, which had been left on the "hallway" line at Yoshiko's were washed by the maid. She used cold water and soap. Before the washing, the maid noticed stains around the thigh of the trousers; she said that the color was a "lot lighter" than the "deep red" of a blackboard eraser, which had been selected from among several articles on trial counsel's table as best representing the color. She also said

same, particularly as to the place at which it stopped. The court-martial could find, therefore, that each witness referred to the same car but was mistaken as to the time.

"there was some dirt below the ankles and also in this area" (described as the area between the knees and hips). That day Chief Warrant Officer Flower of the Investigating Branch, Provost Marshal Activities, came and took away the trousers. The trousers were identified as Prosecution Exhibit 3.

On September 6 the accused was questioned by Captain Burnett. He was first advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, and informed that he was suspected of murder and rape. The accused indicated he understood. He gave the Captain an oral account of his movements from Saturday, September 3, to Sunday, September 4. The accused also said he was willing to cooperate in an investigation into the truth of his statements. He voluntarily provided samples of his pubic and head hairs, his blood and other body fluids, and he "consented" to a search of his vehicle and "personal gear." About 9:00 p.m. the accused's oral statement was reduced to writing and signed by him, after further advice of his rights under Article 31, supra.

Many statements in the accused's account are directly contradicted by other evidence. Several significant examples suffice to show the conflict. Thus, the accused said that on September 3 he was wearing "blue trousers without stripes or checks." On September 7 he was confronted with the trousers which had been taken from Yoshiko's house; he then said he had lost them three weeks before in the unit laundry. However, on September 9 he admitted to Captain Burnett he had lied about the trousers and that he had, in fact, worn them on September 3. His excuse for the lie was that the pants were not in the battery area so he substituted, in his statement, a description of a pair that was available. In the writing, the accused said he went back to the gun site in the early afternoon, and changed his white shirt for a "long sleeved

brown Sports shirt." Several witnesses said he wore a white or "light color" shirt, with a collar which was the color of the shirt worn by Yumiko's abductor. The accused represented in the written account that he went to Yoshiko's about 3:00 p.m. and had sexual relations with her. Yoshiko denied it. He purportedly left Yaka at 7:00 p.m. or 7:30 p.m., went to " 'Pappason's' restaurant in Kadena where I ate a bowl of Chop Suey"; stayed there about thirty minutes; then he allegedly returned to Yaka and Yoshiko's at about 8:30 p.m. or 9:00 p.m. However, a number of witnesses, both prosecution and defense, testified the accused was in the New Paradise Cafe in Ishikawa from about 5:00 p.m. to about 7:40 p.m. or 7:45 p.m. The accused also said in the statement he did not change clothes after he changed to a brown shirt on Saturday afternoon; but again several witnesses testified that in the late evening he wore a "pattern" shirt, and that on Sunday morning he put on the khaki trousers which were in his car in place of the blue checked pants.

On September 8 the accused was again interviewed by Captain Burnett. After advice on his rights under Article 31, he was asked when he first learned of the crime. He told the Captain that "when he read the papers Monday morning he had the feeling that it could have been him." Questioned as to why he had this feeling, the accused changed the subject and "evaded an answer."[17]

The majority of the board of review construed the false statements by the accused as evidence of a "consciousness of guilt." They also so construed his evasion of answers to questions regarding his statement that he felt "it could have been him." However, defense counsel maintain the statements are "consistent with the blind, unreasoning panic of an innocent man, stupidly resorting to a lie to try to escape a net

---

[17] Although no objection to admission of the statement was made at the trial, here admissibility is challenged.

The point will be discussed later in this opinion.

of suspicious circumstances." There is no evidence to show the accused was in a "panic" at the time of his statements. All the evidence is to the contrary. Captain Burnett said he was calm and "in control of all his faculties." From his actions, the court-martial could find that the accused had the presence of mind and the intelligence to ward off, successfully, questioning by a trained investigator about a subject which he had himself introduced.

Appellate defense counsel argue that the accused's September 8th statement shows "a man, so drunk on the night in question that he recalls nothing, agreeing with the investigator . . . he had the feeling at that time that there were grounds for suspecting him." The difficulty with this argument is that it ignores at least two important matters. First, the accused turned aside all questions as to why he had the feeling "it could have been him." Second, just two days before he gave the investigator a very comprehensive statement of his purported activities which, if believed, would have completely eliminated him as a suspect. The September 8th statement is not by any stretch of the imagination evidence of liquor-induced amnesia. See United States v Olvera, 4 USCMA 134, 15 CMR 134. In the context of his written statement and the lie about the trousers he wore on September 3, the September 8th statement is clear-cut evidence of a "consciousness of guilt." Wilson v United States, 162 US 613, 40 L ed 1090, 16 S Ct 895 (1896); Harvey v United States, 215 F2d 330, 332 (CA DC Cir) (1954); see also United States v Harris, 6 USCMA 736, 741, 21 CMR 58.

It will be recalled that the accused provided samples of his head and pubic hairs. These were compared with other hairs obtained in the course of the investigation. Dr. Shintoku testified that Yumiko's head hair was black, and that she had no natural hair in the vaginal area. However, during the autopsy he found a curled brown hair on the exterior of her privates (on the labia majora), and in the vaginal section examination he found three hairs on the inside.

Dr. Kuwashima compared these hairs with those obtained from the accused and some taken from the corpse. First, he visually examined the "color, the length and . . . the adhered substance to the hair." Then, he subjected the hair to a microscopic examination again looking at the color, length, size, and adhered substance. He also examined the "configuration" of the hair, and the top and root of "the hair character." The degree of certainty of the findings in an examination of this kind "varies on occasions." Dr. Kuwashima also admitted he had not examined "many white people's pubic hairs," but, in his opinion, the hair from the labia majora was a brown pubic hair of a person of that race. That hair and one of the four found in the inside of Yumiko's private parts "could be from the same source." The remaining two hairs were compared with samples of head hair taken from Yumiko. In the doctor's opinion, they "could be from the same source."

Other hair comparisons were made. Dr. Kuwashima said it was "very hard to differentiate" hair samples taken from persons of the same race. He said also "except by its maximum diameter" there is no way to determine whether hair comes from a child or an adult. Nevertheless, he gave it as his opinion that a brown hair found on Yumiko's dress could have come from the same source of a known sample of the accused's head hair; some of the black hair found on the rear seat of the accused's car could have come from Yumiko; other hairs found in the car could have come from a different source.

The accused challenges Dr. Kuwashima's opinion because he explained his statement that the hairs "could be from same source" as follows:

"Q. [DC]: Doctor, I want to give you two statements and ask you which is correct or if both are correct or if neither is correct. The first statement is—some of the

**773**

hairs I examined could have come from the same source. The second statement is—some of the hairs I examined probably came from the same source. I ask you which of the two, if any or both, is correct?

"A. With a great possibility I can not say it came from the same individual but I could say it is quite similar. I don't get the meaning of saying 'could be' compared with 'probably'. When I use the words 'could be', the percentage of possibility is rather low. Of course, it has the meaning of positive. I am not saying definitely negative."

Although the "percentage of possibility is rather low," the weight to be given to the doctor's testimony was for the court-martial to determine. The evidence of the comparison itself was admissible.

In addition to the hair comparisons, Dr. Kuwashima made several blood type tests. The pants worn by the accused on September 3 respond positively to a luminal test which showed the presence of a fluid on the "inside of the trousers on the right fly." Blood, in the doctor's opinion, is the only human fluid which would show such a reaction, but several nonorganic substances, such as oxidized iron and other metals and some organic substances which the doctor could not "say very clearly," would give the same reaction. A small stain made by human blood was found on the Hawaiian shirt between the first and second button. The shirt was recovered from the unit laundry but in Dr. Kuwashima's opinion it had not been laundered since the spot got on the shirt. Human blood stains were identified on a car door handle found on the front seat of the accused's car, on a twenty yen note found in the car, and on a portion of the front riser of the "rear seat cover."

Appellate defense counsel contend the blood could not be typed and, therefore, it could have come from someone other than the accused or the victim. They maintain the blood on the back

seat cover was typed as B or AB, and this type does not correspond to that of the accused which is O, or to Yumiko's, which was type A. Counsel, however, read much more into the doctor's testimony than he was willing to say.

Cross-examined by defense counsel on the type of human blood found in the car, Dr. Kuwashima said he could not determine the type. Apparently in his initial laboratory report he had indicated it might be B or AB, but at the trial, he said: "I rather say I don't know, the amount was too small to type and I had to consider the possibility that the seat on which the spot was found was dirty." At one point he said "it is not right to go further on this discussion concerning the type." The court-martial, therefore, could find the blood was not sufficient to be correctly typed and that it could have been from the victim.

The connection of the blood-stained shorts with the accused is also disputed. At the trial, and on this appeal, the defense asks: "How, then, did the accused change his shorts and, if he did, why did he not also change his pants, which pants, the prosecution claims were . . . blood-stained and indicative of his guilt?"

Just when and under what circumstances the change was made is not certain. The court-martial could find that the following occurred: The child met her death on the east-west road at the place where her panties were discovered. Prosecution Exhibit 1, with other testimony, shows that the area is grassy; grass stains were found on Yumiko's dress by Dr. Kuwashima. When Yumiko's abductor discovered the child was not breathing, he attempted artificial respiration, as evidenced by the finger marks on her chest. The general movements used in that maneuver are common knowledge. They would account for soil stains around the cuffs and for stains on the trousers in the area between the knees and thighs, which in Yoshiko's words appeared to be "brushed on lightly." They would also account for the turning of the body from one position to an-

774

other, a point which troubled the defense at the trial. Failing in the effort to restore life, the killer took the corpse to the quarry. On the way from the quarry, he realized he had to dispose of his bloody shorts. He stopped at the side of the road and changed into the shorts which the court-martial could logically find he had taken with him in the afternoon when he took the extra shirt and pants. Just as he accomplished the change, Seian appeared. He was startled. He started up, proceeded to the south quarry area where he disposed of the shorts. En route, he threw the child's slippers out on the beach. Realizing further that he might be identified by his white shirt he changed into the Hawaiian shirt which was in the car. Reasoning that it was Saturday night and she might be too busy with "customers" to notice the time, he proceeded to Yoshiko's to establish a possible alibi.

If there are inaccuracies in the reconstruction of the crime, they are not important. The court-martial is not required to find beyond a reasonable doubt that the criminal accomplished certain post-offense acts in a certain way or at a certain time. It need only be satisfied beyond a reasonable doubt that the accused committed the acts charged. Seian's testimony establishes a reasonable connection between the clothing and the car of the man who abducted Yumiko. Matsuda's and Keiman's testimony reasonably link the car seen by Seian with that on the east-west road at the spot where the blood-stained shorts were found. The shorts are connected with the car and the clothes of the accused.

There is other evidence about the blood-stained shorts which could be considered by the court-martial. It was stipulated that the accused wears *size 30* shorts. Captain Burnett testified that the blood-stained shorts had no identifying marks, but they were similar to Quartermaster issue. They measured fifteen and one-half inches in diameter. As a result, Captain Burnett said the shorts were a *size 31*. That a garment measures thirty-one inches in circumference at the waist does not necessarily establish *its size*. Consequently, the court-martial could conclude that although *called* size thirty-one by Captain Burnett, the shorts might actually correspond to the size worn by the accused.

A search "through all gear" of the accused uncovered no other shorts belonging to him, except possibly a pair included in a rolled "inspection kit."[18] Two logical inferences could be drawn by the court from this circumstance. First, it could reason the accused possessed no other shorts. This possibility is highly improbable; it would mean the accused either had to go about without shorts while the one pair was being laundered, or he had to wait in his room until they were washed and dried. The other, and more reasonable inference is that the accused had at least one other pair of shorts in addition to the "inspection kit" pair and the pair he wore. The court could find that the extra pair was with the shirt and trousers which he took with him when he left the unit area in the early afternoon with Senegal. The accused attempts to discount this conclusion by emphasizing that Senegal testified he saw no shorts in the car. However, Senegal made no mention of the khaki pants which were in the car with the other shirt. Consequently, the court-martial could conclude that he simply saw the shirt, but not the pants and shorts.

Other items of evidence are discussed in the briefs. Some tend to identify the accused as the criminal; some are either neutral or favorable to the accused. We need not go into the details. No higher standard of proof of guilt is required in a circumstantial evidence case than in a case proved by the testimony of eyewitnesses. United States v Mason, 8 USCMA 329, 24 CMR 139. In our opin-

[18] The actual contents of the "kit" was not disclosed. It is reasonably inferable that it included a pair of shorts.

775

ion, the evidence in the record of trial supports the court-martial's finding of guilt beyond a reasonable doubt.

Three errors are assigned in connection with the testimony of the witness Mitsuru Yamashiro. First, it is argued that Mitsuru "conclusively" showed his testimony was based upon hearsay, and it is impossible to distinguish between the competent and incompetent parts of his testimony. We have examined the testimony with care, both from the standpoint of Mitsuru's competency and the limitations the law officer placed on his testimony when it appeared that Mitsuru's identification of the accused personally was based upon a newspaper picture.

Whether a child is competent to relate truthfully what he saw and heard about matters under inquiry is a question for the law officer. United States v Hunter, 2 USCMA 37, 43, 6 CMR 37; United States v Slozes, 1 USCMA 47, 1 CMR 47. Here, the law officer conducted a preliminary hearing into Mitsuru's understanding of the difference between truth and falsehood and the penalty to which he would be subject for telling an untruth. He also tested Mitsuru's ability to relate things within his experience. He "intentionally" asked the witness "complicated questions" to test his intelligence. He obtained from the witness a promise to tell "only what . . . [he] actually saw with . . . [his] eyes and heard with . . . [his] ears and not to tell . . . anything that someone else told" him to say. On the showing made, we are satisfied the law officer's ruling permitting the witness to testify was correct.

In his direct examination, Mitsuru identified the accused as the person who "carried away" Yumiko. On cross-examination, he was questioned about two line-ups he attended, at which the accused was present. He admitted he could not pick out the accused at these line-ups as the man who abducted Yumiko. Defense counsel then asked if he had seen the accused's picture in

the newspaper. Mitsuru answered in the affirmative. He said his father showed him a picture and told him it was the "man who picked up Yumiko." Further questioning disclosed that after this incident the witness attended another line-up. On this occasion it was "easy" for him to pick out the accused. Defense counsel thereupon moved to strike all Mitsuru's testimony on the ground that he could not distinguish between his "impressions and what he saw." The law officer questioned Mitsuru further. Part of the examination is as follows:

"Q. [LO] Is the reason that you picked out this man here today as being the man you saw pick up Yumiko because you were shown his picture in the paper?

"A. Yes.

"Q. When you were shown the picture in the newspaper did you know who that was before they pointed out who it was?

"A. No.

"Q. Had you ever seen the person of whom that picture was prior to being shown the picture?

"A. Yes, I had.

"Q. When was that?

"A. I don't know.

"Q. But that was not the man that you remember picking up Yumiko?

"A. Yes, it was.

"Q. You would not be able to pick out this man that you did today, if you had not been shown the picture in the newspaper, is that correct?

"A. No.

"Q. Do you think you would be able to pick out this man today, if you had not seen the picture in the newspaper?

"A. No.

"Q. So, is the only reason that you are able to pick out this man today because you were shown the picture of him?

"A. Yes."

Defense counsel resumed the cross-examination without "waiving" his mo-

tion to strike. Mitsuru remained unshaken in his testimony on what he saw when Yumiko was abducted. When court reconvened the next morning, the law officer informed the court-martial that "After carefully studying" Mitsuru's testimony, he was granting the motion to the extent of eliminating all Mitsuru's answers regarding his identification of the accused as the one who "carried away" Yumiko. He instructed the court to disregard completely the stricken testimony. The testimony which was permitted to stay in the record was read. At the conclusion of the reading, the law officer asked the court members to raise their hands if they felt they could not fairly and impartially try the case because of the testimony that had been stricken. No member raised his hand, and the trial continued.

Mitsuru's testimony indicates an ability to distinguish what he saw and heard from what others told him. He demonstrated the ability in his testimony about the newspaper photograph and his ready admission that he could not have recognized the accused if he had not seen his picture in a newspaper.[19] His answers to questions on what he saw and heard are direct and substantially . consistent. Appellate defense counsel attempted to discredit his testimony because there are some purported discrepancies. For example, they contend he did not know his own age, giving it as nine when he was only eight. Mitsuru said he was born on February 23, 1947, but according to the Far Eastern basis of calculating age he would be nine at the time of trial. See United States v Hunter, supra, page 42. We conclude that the law officer did not err in denying the motion to strike all of Mitsuru's testimony.

The second aspect of the attack on Mitsuru's testimony is that the law officer should have declared a mistrial because the stricken part of the boy's testimony could not be erased from the minds of the court members. Sometimes the instruction to disregard testimony stricken from the record is incapable of removing the risk of prejudice. United States v Diterlizzi, 8 USCMA 334, 24 CMR 144. However, as a general rule, clear and explicit instructions to disregard are presumed to be followed by the court. United States v O'Briski, 2 USCMA 361, 363, 8 CMR 161; United States v Shaughnessy, 8 USCMA 416, 418, 24 CMR 226; United States v Shepherd, 9 USCMA 90, 95, 25 CMR 352. Here, the force of the identification of the accused was substantially weakened by Mitsuru's failure to pick the accused out of a line-up, and by his admission that his father told him the man in the newspaper photo was the one who had "picked up" Yumiko. Under these circumstances, we think the admonition to disregard the testimony of identification was conscientiously followed by the court-martial. All the members said they were not prejudiced by the stricken testimony and they could and would act impartially in the matter. Cf. United States v Diterlizzi, supra, page 337. In our opinion, the law officer did not abuse his discretion in not declaring a mistrial. United States v Wolf, 9 USCMA 137, 25 CMR 399.

In a "Petition" filed in this Court the accused personally contends that Mitsuru was "coached" by the prosecution. There is absolutely no evidence to support the claim. A reading of the boy's testimony completely refutes the charge. United States v Slozes, 1 USCMA 47, 55, 1 CMR 47.

---

[19] Mitsuru's inability to recognize the accused before he saw his picture in a newspaper is not necessarily inconsistent with his ability to recognize him in the line-up. It is common experience that a particular view of an object or person will stimulate the memory where other views had failed. Significantly, even while admitting he could not have identified the accused but for the picture, Mitsuru insisted the accused "was" the man he remembered picking up Yumiko. Trial counsel apparently recognized this frequent phenomenon, because he attempted, unsuccessfully, to show the "quality of photographs printed in the Japanese newspaper."

Also challenged is the law officer's admission into evidence of pretrial statements made by the ac- cused. Only one of the three disputed statements was objected to, namely, the written statement of September 6. This statement was admissible. The basis for admission is plainly set out in United States v Smolin, 182 F2d 782, 786 (CA 2d Cir) (1950):

". . . exculpatory statements, such as those appellant made upon interrogation, when shown to be false, are circumstantial evidence of guilt consciousness and have independent probative force. . . . Testimony as to them is, therefore, admissible on the government's direct case; . . ."

See also United States v Freeman, 167 F2d 786, 790 (CA 7th Cir) (1948).

A statement was made by the accused when he was first taken into custody on September 6. He was in- formed by the investiga- ting agent that they "wanted to talk" to him at the office. The agent asked the accused if he "knew what it was about," and the accused replied that he "read about the little girl's being killed in the newspaper." The final "statement" consists of Captain Burnett's testimony to the effect that the accused evaded further questioning regarding his statement that he had a feeling "it could have

been him." Since the accused himself opened up the subject, the latter "statement" falls within the same category as the September 6 statement. However, the former presents a different problem. A law enforcement official who proposes to question a suspect must *tell* him of the offense of which he is suspected, not *ask him* to give the purpose of the inquiry. Article 31, Uniform Code of Military Justice, 10 USC § 831. In our opinion, however, any error in the admission of the testimony was waived by the failure to object. United States v Fisher, 7 USCMA 270, 22 CMR 60. Although we are reluctant to apply the rule of waiver, it is entirely justified in the present situation because both at trial and before the board of review the matter was considered to be either inconsequential or favorable to the accused.[20]

Another disputed ruling by the law officer concerns the result of a search of the accused's car on September 9. In an out-of-court hearing, it was shown that on September 6, the car was searched without authority and without the accused's consent. The law officer ruled out testimony of the result of that search. A second search was made on September 9. The prosecution relied upon the accused's consent for this search. Captain Burnett testified as follows:

"Q. Did you advise him of his rights under Article 31 prior to this conversation?

---

[20] The statement was not referred to by trial counsel or the law officer. Defense counsel mentioned it in closing argument as follows:

". . . But what could he have meant when he said, 'I felt it might have been me.' He might have asked himself the same question, gentlemen, that maybe hundreds of other GI's asked themselves, when they read it in the newspapers, namely, 'Where was I on the night of 3 September?' and, if any of them had an old car in Yaka, they may well have said the same thing, 'For all I see in this paper it might have been me.' If I ever read in the newspapers that there was a murder committed in the Machinato housing area by someone

with a 51 Plymouth, I may well wonder the same thing to myself, 'it might have been me', knowing full wull [sic] that it wasn't. But would a guilty man make a statement like that, 'I felt it might have been me?' There is only one possibility that he would and that is, if he didn't remember anything that he had done."

The dissenting member of the board of review said of the statement: "Considering the publicity given this crime in Okinawa, I do not find this remark so unusual or so incriminating. As a matter of fact, it would seem to me far more reasonable for a guilty man, in such circumstances, to merely say he did not know why he was to be interrogated."

"A. I did.

"Q. What was the nature of that advice?

"A. I advised Sergeant Hurt that he was suspected of the rape and murder of Yumiko Nagayama and that he had his rights as prescribed under Article 31 of the Universal Code of Military Justice, that he did not have to answer any questions, that any questions that he might answer could be held against him in the event of trial by court-martial.

"Q. Did the accused state that he understood?

"A. He did.

"Q. What happened then?

"A. I questioned Sergeant Hurt as to his activities on Saturday, 3 September and on the morning of Sunday, 4 September, and asked him where he had been and what he had been doing and he told me the story of his activities.

• • • • •

"A. I asked Sergeant Hurt if the statement he had given me was true and if he was willing to cooperate in the investigation to determine the truth or falsity of this statement. I first asked him if he was willing to submit samples of his blood and body fluids, if he was willing to submit samples of hair and if he was willing to allow us to examine his items of personal gear and his vehicle to find out if there was any evidence of the crime that was committed.

"Q. Did the accused make any response to these questions?

"A. He stated that he would cooperate and that he would be willing to submit all the items that I had asked for and he consented to the search of his vehicle and his personal gear."

On September 9 a "technical search of the car was made by the Chief of the Chemistry Section, Far East Criminal Laboratory, who had been especially requested. Captain Burnett said that this search was not occasioned by the results of the search of September 6 and that it was based upon the permission granted by the accused. At the time, the accused was under arrest on suspicion of committing the crimes. As defense counsel contend, this is a circumstance tending to show acquiescence in, rather than consent to, the search. Judd v United States, 190 F2d 649 (CA DC Cir) (1951). But the circumstance is not controlling. There is here substantial evidence of affirmative consent. Besides Captain Burnett's testimony, there is the fact that the accused had earlier voluntarily provided a complete statement of his purported activities and had voluntarily furnished samples of his hair and body fluids which were admitted into evidence without objection. The law officer could find from the accused's willingness to accord the agents full opportunity to investigate him that he gave specific authority to search his car. United States v Wilcher, 4 USCMA 215, 15 CMR 215.

Objection is also made to the introduction into evidence of photographs of Yumiko. It is alleged that these photographs served only to arouse the passion of the court members to the prejudice of the accused. The first photograph, Prosecution Exhibit 10, served to identify the victim and the position of her body, matters which were important to the case. We find no error in its admission. United States v Thomas, 6 USCMA 92, 97, 19 CMR 218; United States v Harris, 6 USCMA 736, 744, 21 CMR 58. The others, Prosecution Exhibits 11 and 12, are essentially the same; perhaps they need not have been admitted in evidence, but we cannot say the law officer abused his discretion in permitting them to come in.

Other actions at the trial are also asserted as errors prejudicial to the accused. Certain civilian witnesses for the prosecution and the defense were permitted to testify on affirmation, instead of on oath, without preliminary inquiry into whether they believed in God. At the time of trial and before the revision of the Uniform Code, Article 42(b), 50 USC (1952 ed) § 617,

provided that a witness "shall be examined on oath or affirmation." The 1956 revision does not mention affirmation. 10 USC § 842. Whether the change is one of substance or form need not concern us because it came after the trial. See House Report No. 970, 84th Congress, 1st Session, page 65. Generally, a witness is ▮▮▮▮▮ *sworn* to tell the truth, but he may affirm to tell the truth if he does not desire to take an oath. 98 CJS, Witnesses, § 320a. Each witness who was affirmed was a native of either Okinawa or Japan. It would appear that the parties had made a preliminary determination that the personal beliefs of the witnesses favored affirmation instead of oath. If there was error in the proceedings it was waived by the accused. See United States v Slozes, supra, page 53.

Appellate defense counsel contend that trial counsel prejudiced the accused by improper comment at the trial. They concede trial counsel could strike "hard blows" but they say he struck "foul ones." Berger v United States, 295 US 78, 79 L ed 1314, 55 S Ct 629; United States v Valencia, 1 USCMA 415, 4 CMR 7. They charge him with arguing theories which had been declared to be irrelevant by the law officer, with commenting on the accused's character when he had not put his character in issue, and with "covertly commenting" on the accused's silence "in complete derogation" of his right to remain silent. The statements which are said to establish these violations of correct trial practice are as follows:

(1) "There is another interesting psychological point in this case that I would like to mention briefly, and that is, the purchase of child's toys on Sunday morning. *To me that indicates that, buried somewhere deep inside, the accused felt a bit of remorse* about what he had done even though that remorse did not show on the surface or otherwise influence his actions." [Emphasis supplied.]

(2) ". . . Perhaps, by some odd mental process, *he felt that a six-year old was his only assurance of virginity* in a sexual partner." [Emphasis supplied.]

(3) ". . . The prosecution theory that *the accused is cold-blooded enough to kill deliberately* is buttressed by the fact that, when he turned up at Yaka late that night in blood-stained trousers—blood-stained trousers which were a mark of his guilt—he showed very little signs of emotional upset. It takes *someone with very little emotion* to attempt even to brazen out a pair of blood-stained trousers, which the person knows are stained with the blood of his recent victim, and, to be able to do so without appearing extremely jittery, indeed takes *a person like our emotionless accused, who has sat here during the entire trial without a flicker of emotion crossing his face despite any evidence that might have come from the witness stand. I am convinced, personally, that his blood must be about the temperature of ice water.*" [Emphasis supplied.]

(4) ". . . The assertion by the accused of such sexual prowess tells us something about his subconscious as well as about his conscious mind. It tells us that *he is overly interested in sex,* that he *may well feel sexually inferior* in normal sexual relations, and *must seek his gratification upon the bodies of five hundred yen prostitutes and little girls.* I think it is well settled that *braggarts and extroverts of all natures are often produced by feelings of inferiority* which are buried deep inside, which a person may well not be aware of himself." [Emphasis supplied.]

(5) ". . . The accused's actions on 4 September 1955, his behavior while in custody, which includes his statements after arrest on the 6th of September, have made *Sergeant Isaac Jackson Hurt the star prosecution witness in the case of United States versus that same Isaac Jackson Hurt.*" [Emphasis supplied.]

The first italicized statement is attacked on the ground that it urges a theory which the law officer held was irrelevant. The argument misinterprets the law officer's ruling. After an out-of-court hearing the law officer excluded evidence to the effect that, when the accused and Yoshiko had gone to the restaurant for breakfast on Sunday morning, the accused wanted to take a toy that hung back of him. Yoshiko told him "it is bad to steal," and suggested he could "buy" one on the way home. But there was admitted without objection, evidence to the effect that on the return trip the accused, in fact, stopped and gave Yoshiko two hundred yen for the purchase of some toys. In view of this testimony, trial counsel's statement is not improper. Bell v United States, 100 F2d 474 (CA5th Cir) (1938). If it is an illogical or absurd deduction from the evidence, the remedy is exposure and answer by defense, not sua sponte interference by the law officer. Pressley v State, 207 Ga 274, 61 SE2d 113, 116.

The second and fourth group of remarks are proper comments on the evidence. Contrary to the accused's contention, they do not unjustifiably inject the accused's character into the case. In our opinion, the remarks are permissible argument on the inferences that may be drawn from the facts in evidence. United States v Ransom, 4 USCMA 195, 202, 15 CMR 195; United States v Day, 2 USCMA 416, 425, 9 CMR 46. As we said in the *Day* case, "facts and circumstances interwoven with the offense need not be shunned even though they cast accused in an unfavorable light." See also United States v Wexler, 79 F2d 526 (CA2d Cir) (1935). The comments in the fifth group do not remotely suggest that the court-martial should draw an adverse inference from the accused's failure to testify. They constitute a recital of the evidence and a suggestion as to the importance of that evidence to the prosecution's case.

The remarks in group 3 are alleged to represent both improper comment on matters not in evidence and improper comment on the failure of the accused to take the stand. The prosecution is entitled to comment on the accused's conduct in "uncomplimentary terms." United States v Freeman, 167 F2d 786, 791 (CA7th Cir) (1948). Reference to the accused's lack of emotion in "brazen[ing] out a pair of blood-stained trousers" is a permissible inference from the evidence of the accused's conduct at the time. Calling attention in final argument to the accused's presence in the courtroom is not comment on his failure to testify. Reining v United States, 167 F2d 362 (CA5th Cir) (1948). But even if it could be so construed, the error was corrected by the law officer. At the express request of defense counsel, he explicitly instructed the court that it could not draw any unfavorable inference from the accused's failure to testify. See Dubrin v United States, 93 F2d 499, 506 (CA2d Cir) (1937); 53 Am Jur, Trial, § 506, page 408.

Trial counsel's expression of personal opinion on the accused's "blood . . . temperature" may be considered objectionable. However, it seems wholly incapable of influencing the deliberations of the court members on the accused's guilt or innocence. What was said by the Court of Appeals for the District of Columbia in a related situation is appropriate here:

"The objectionable remark was made under conditions which we think nullified any harm that might have resulted in different circumstances. The rape of a little girl, with all its horrible details,—even as recited by the accused, must inevitably be regarded as a sexual crime of fiendish depravity. It would challenge our imagination to suppose that any group of persons, or any jury, with ordinary standards of decency could escape such an impression. Granting that the

statement was improper, it seems fair to assume that any ill effects had been discounted and neutralized by the horrible incidents of the crime as they had been portrayed to the jury." [Hall v United States, 171 F2d 347, 350 (CA DC Cir) (1948).]

See also State v Jones, 51 La Ann 103, 24 So 594.

The last disputed item is trial counsel's reference to the lack of emotion on the face of the accused ▮▮▮▮▮▮ during the course of the trial. Insofar as it merely calls attention to the accused's presence in the courtroom it is not, as we have pointed out, reversible error. As a comment on the accused's conduct at the trial, it is objectionable. It injects matters into the case which cannot be considered by the court-martial. But it is not comment on the accused's failure to testify. A strikingly similar situation was present in Norris v State, 64 SW 1044 (Tex Crim App) (1901). In that case the prosecution referred to the defendant's appearance at the trial and remarked that he had gone through the trial "without any sign of emotion or change in his countenance." On appeal it was contended the statement constituted an indirect reference to the accused's failure to take the stand. Rejecting the argument, the Court of Criminal Appeals said:

". . . While such remarks should not be indulged, and the prosecuting officer should be careful about such things, we do not see how harm resulted to appellant; his conduct being before the jury, and subject to their observation. The court immediately stopped the county attorney, and admonished him against further argument of this character, and instructed the jury not to consider the remark. This would not justify reversal of the judgment. Thomson v State (Tex Cr App) 44 SW 837; Schroeder v State (Tex Cr App) 36 SW 94. It was not an illusion to failure of appellant to testify in his own behalf."

**782**

Nor, in our opinion, is trial counsel's comment prejudicial from the standpoint of injecting extraneous evidence into the case. Of course, the Government cannot use the "compelled presence of defendant at the trial as evidence to convict him when he exercises his right not to testify," but remarks of the kind in question are not reversible error *per se*. State v Jordan, 80 Ariz 193, 294 Pac2d 677, 682 (1956). The statement here is part of a permissible argument on the accused's conduct in connection with the offenses charged. Only by being taken out of context does it imply that the court could consider the accused's conduct at the trial in its deliberations on his guilt or innocence. Under the circumstances, there is no fair risk that the court-martial regarded the accused's conduct at the trial as independent evidence of guilt. State v Jordan, supra.

The accused contends the law officer also erred in bringing his character into the case. The allegation of error is based upon the following instructions:

". . . You are not to be influenced by any knowledge of the acts, *character*, or service of the accused *not* based on the evidence or other proper matter before the court. . . ." [Emphasis supplied.]

The accused argues that under the instruction, the court-martial could, to the extent shown by the ▮▮▮▮▮▮ evidence, consider his character in determining his guilt or innocence. Since there is evidence of bad character, the argument continues, prejudice is manifest. We do not construe the instruction in that light. It merely admonishes the court members to consider nothing which was not admitted in evidence or properly before it.

The availability of the Manual for Courts-Martial, United States, 1951, to the court members is ▮▮▮▮▮▮ presented as a ground of error. Appellate defense counsel concede that the case was tried

at a time when it was the accepted practice for the court-martial to have the Manual for certain purposes. United States v Rinehart, 8 USCMA 402, 24 CMR 212; United States v Boswell, 8 USCMA 145, 23 CMR 369. In connection with the findings, the law officer referred the court-martial to the rules provided by paragraph 74*a*, to the method of voting as described in paragraph 74*d*, and to Article 52 of the Uniform Code, 10 USC § 852. We find nothing in the court's use of the Manual for these matters which can reasonably be regarded as prejudicial to the accused. United States v Vara, 8 USCMA 651, 25 CMR 155. Before the court retired for sentence deliberation, the law officer instructed it to refer to Appendix 13 of the Manual for guidance on the forms of sentence that could be used. Reference to the Manual for this purpose was not prejudicial.

For his final claim of trial error, the accused contends the sentence is not "the product of a properly informed court" because the members were lead to believe they could not consider, in determining the sentence, any doubt they may have entertained as to the accused's guilt. The contention is based upon a question asked by trial counsel in the voir dire and a discussion of the same point in the Manual for Courts-Martial. Both are set out in the margin.[21] The substance of the argument is that, despite the announced findings of guilty, a court member, when voting on the sentence, can consider the doubts he may have had as to the accused's guilt when he voted on the findings.

Article 52(b)(1) of the Uniform Code requires the concurrence of all the court members for a death sentence. There is no limitation on what matters the court members can consider. From this circumstance, the accused concludes that the Manual provision imposes an extralegal limitation on the court's right to consider *any matter*, including doubt as to the findings, in fixing the sentence. Support for the argument is sought in an analogy to the construction given the predecessor provision of 18 USC § 567 by the United States Supreme Court in Winston v United States, 172 US 303, 43 L ed 456, 19 S Ct 212. The statute provided that if the accused was convicted of murder in the first degree or of rape the jury could qualify the verdict by adding "without capital punishment." At the trial the judge instructed the jury that Congress intended qualification of the verdict only when mitigation or palliating circumstances existed. The Supreme Court held that the instruction was erroneous in that the statute did not "prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise" of the right to qualify the death sentence to cases in which mitigating circumstances existed.

The Government contends the Manual provision does not limit the court-martial's discretion in determining a proper sentence. It says the provision merely "emphasizes the separateness of conviction and sentencing in court-martial proceedings" and indicates the findings must be accepted as the basis for a determination of the sentence.

In our opinion, this is all the Manual

<hr>

[21]"TC: The charge of murder requires, if a finding of guilty is made thereon, the imposition of either a sentence to life imprisonment or a sentence to death. The percentage of the court required to convict for a specification such as we have under Article 118 is three-fourths. The percentage of the court required to impose the death penalty is unanimous. If you should be among the one-fourth of the court voting not guilty if the accused should be convicted, do you believe your prior vote of not guilty would influence your choice of a proper sentence in the case?"

Paragraph 76*b*(2): "It is the duty of each member to vote for a proper sentence for the offense or offenses of which the accused has been found guilty, *without regard to his opinion or vote as to the guilt or innocence of the accused*. Any sentence, even in a case where the punishment is mandatory, must have the concurrence of the required number of members." [Emphasis supplied.]

provision intends to say. United States v Walker, 7 USCMA 669, 23 CMR 133. We pointed out in the *Walker* case that whatever the nature of the offense a finding of guilty is determined by a two-thirds vote of the court members, whereas the percentage vote for a sentence varies from two-thirds to unanimity, according to the severity of the sentence. Determination of the findings and sentence are "separate functions" and the vote on each is "unconnected." Ibid, page 673. In fact, the functions are so unconnected that a court-martial can sit only for the purpose of adjudging a sentence on the basis of findings of guilty determined by a different court-martial. United States v Oakley, 7 USCMA 733, 23 CMR 197; United States v Field, 5 USCMA 379, 18 CMR 3. However, in the Federal criminal court the jury must return a single verdict showing both the findings of guilty and the qualification of the death sentence. Andres v United States, 333 US 740, 92 L ed 1055, 68 S Ct 880 (1948). The rationale of the *Winston* and *Andres* cases is, therefore, inapplicable. The Manual provision does not purport to limit or qualify in any way the right of each court member to choose between the sentence alternatives provided by the Uniform Code. A sentence to death requires a unanimous vote. The record of trial shows that there was such total agreement on the vote. There is, therefore, no merit in the claim that sentence is "the product" of a uninformed or misinformed court.

Turning to the initial review of his conviction, the accused contends he was prejudiced by two acts of the staff judge advocate. First, he maintains the staff judge advocate used an "appellate court standard" in judging the sufficiency of the evidence and in recommending to the convening authority affirmance of the findings of guilty. See United States v Jenkins, 8 USCMA 274, 24 CMR 84. The staff judge advocate reviewed the evidence in great detail. He pointed out that the identity of the accused was the principal question in issue, and that that question had been determined by the court adversely to the accused. He then enumerated individually the principal items of evidence leading to that conclusion. In each he clearly indicated his opinion of the nature and the effect of the evidence. He ended his analysis with the comment: "Considering all of the foregoing factors, I cannot but conclude that the court was fully justified in finding that guilt of the accused was established beyond a reasonable doubt, and that a hypothesis of innocence, considering all of the facts and circumstances, would not have been reasonable." Later in the review he gave it as his opinion that the "competent evidence established that the findings of guilty are correct in law and fact." Considered as a whole, the review plainly indicates the staff judge advocate agreed with the determination of the court that the evidence established the guilt of the accused beyond a reasonable doubt, factually as well as legally. We find no merit in this objection. United States v Pitcher, 9 USCMA 119, 25 CMR 381; United States v Murphy, 9 USCMA 316, 26 CMR 96.

The second claim of error in regard to the review is that the staff judge advocate improperly referred to the accused's refusal to answer questions concerning the merits of the case. The reference, says the accused, resulted in the consideration of matter outside the record of trial on the question of his guilt or innocence. The staff judge advocate had a personal interview with the accused. He noted that the accused talked freely and directly about his background. He also observed that the accused did not appear to be "the vicious type." He asked the accused if he could provide matter for clemency; the accused replied in the negative. The further course of the interview is as follows:

"(3) Finally, I asked if he felt that his counsel had represented him well, and he said that his counsel had done an excellent job, that he had no complaint. Following this, I said, 'Do you think you got a fair shake?' and he replied in the negative. He said he could not have gotten a fair trial on Okinawa, for the court mem-

bers were bound to read the newspapers, since he (the accused) did.

"(4) Immediately after the foregoing statement, the accused said that the Okinawan girls lied, then added, 'I didn't do it.' After this tacit denial of guilt, I asked if he wished to tell me anything about his activities on the night of 3 Sept, so that I might tell the Commanding General what he was doing, and he said that he had nothing further to say."

The review impresses us as a genuine effort to obtain mitigating matters from the accused. It ▉▉▉▉▉ seems to us that, rather than constituting extra-record evidence of guilt, the report of the accused's remarks invites further scrutiny. An accused's insistence on innocence, despite conviction, gives one pause, and naturally leads to reexamination of the evidence of record. United States v Buck, 9 USCMA 290, 26 CMR 70. We discern no possibility of prejudice in the report of the interview with the accused.

The last item relied upon by appellate defense counsel is a petition for new trial. The petition was originally based upon the law officer's denial of a change of venue. The ground is substantially the same as the assignment of error which was considered by the board of review and determined by it to be without merit. We considered the claim earlier in this opinion and reached the same conclusion. Accordingly, we affirm the board of review's denial of the original petition.

After this Court heard oral arguments and took the case for decision, appellate defense counsel filed a motion described as a "Motion For Leave To File Instanter Attached Documents and Pleading In Support Of Petition For New Trial." The ground for relief alleged in the motion is different from

that presented to, and acted upon by, the board of review in the original petition for new trial. It is arguable, therefore, since the motion was filed more than a year after the decision of the board of review denying the original petition for new trial, that the present application is, in effect, a new petition for new trial. However, the Government did not oppose the relief sought. Accordingly, we granted the motion, but we express no opinion on its timeliness. See Article 73, Uniform Code of Military Justice, 10 USC § 873. The accused also moved for oral argument on the amended petition for new trial; that motion was denied.

From the papers presented in support of the "Motion to File Instanter," it appears that after the decision of the board of review denying the motion for reconsideration and the petition for new trial, the accused's then appellate defense counsel, through the Correspondence Branch of the office of The Judge Advocate General, United States Army, requested the original exhibits of the hair found on the victim and in the accused's car be turned over to him. No motion for such relief was filed with the board of review or with this Court, and no notice thereof was given to Government counsel. Eventually, the physical exhibits were obtained. Together with newly procured samples of the accused's head and pubic hairs they were forwarded by counsel to Dr. Paul L. Kirk, Professor of Criminalistics, School of Criminology, University of California, for a comparison examination. No notice of this action was given to Government counsel.[22]

Before discussing the specifics of Dr. Kirk's examination, some preliminary comments are in order. ▉▉▉▉▉ Article 73 limits an application for a new trial to two well-defined grounds: (1) newly discovered evidence, and (2) fraud on

---

[22] The accused's present appellate defense counsel excuses the failure to give notice on the ground that he is not bound to submit newly discovered evidence to the Government for its preliminary inspection. This view of the matter overlooks the fact that the actions taken by defense counsel involve evidence which already constitutes a part of the record of trial. Counsel is not free to do what he wills with such evidence. The nature of the case, however, impels us to pass over the errors in the defense procedure.

the court. The ground relied upon by the accused, and the only one remotely in point, is the first. Patently, the hair offered in evidence at the trial is not newly discovered. It was already known and on hand. At the Article 32 investigation, held more than a month before trial, defense counsel represented to the investigating officer that he had "already had a chance to examine" a Far East Criminal Laboratory report which included a comparison examination of the hair sample. At the investigation, defense counsel questioned Captain Burnett on his experience with "this type of evidence." He elicited from the witness, testimony to the effect that similarity of hair was not like fingerprint identification; the similarity meant merely that it "is possible" that the person could have been in the place where the hair was found but "it does not specifically tie that person to the place." According to the Captain, similarity provides only "general corroborative investigative leads." There is strong reason to believe, therefore, the defense did not think it necessary to obtain expert testimony. And had it desired such testimony for the trial, there is no indication it could not have obtained it just as readily as it was obtained after the adverse decision by the board of review on the petition for new trial. The trial defense counsel alleges the defense did not procure expert testimony for the trial because "there was no qualified expert" on Okinawa and the defense "had no reason to believe" that an expert "with qualifications superior" to those of Dr. Kuwashima was available in Japan. Apparently, no effort was made to obtain an expert of equal or even lesser qualifications than possessed by the prosecution witness, either in Japan or in the continental United States. Cf. United States v Schick, 6 USCMA 493, 20 CMR 209. Presumably, Dr. Kirk is a "superior" expert. His testimony, however, is merely an interpretation of evidence used at the trial. In other words, he offers no new and independent matter. Cf. United States v Bourchier, 5 USCMA 15, 17 CMR 15. Consequently, we conclude that the present application is not based upon newly discovered evidence within the meaning of Article 73. Assuming, however, that in the interests of justice we may consider Dr. Kirk's findings, what is the purport and effect thereof?

For hair to be regarded as coming from the same source, says Dr. Kirk, all its morphological factors, such as pigment distribution and pigment color, diameter, medullary condition, scale pattern, etc., "must be consistent." If inconsistency is found, the origin is different "or—at the least— . . . prevent[s] an identity being based on morphological characters."

Dr. Kirk further states that "no person can be absolutely identified at the present time by his hair alone." He maintains that a "high probability of common origin of two hairs" can be established by careful study; and it can also be established by discrepancies in characteristics that each of two hairs has a different origin. In regard to the latter, he says hair characteristics of the same person vary and a "statistical range of each factor" must be established by a comparison of multiple samples from that person.

In summary, Dr. Kirk maintains it is not "even possible" that the hairs found on the victim were from the accused. His conclusion, he contends, is "completely positive" with regard to the head hairs. However, he admits the conclusion is "less decisive" in regard to pubic hairs "because far less is known of pubic hairs than of head hairs; partly because pubic hairs are more variable than head hairs." He also admits to at least two uncertainties in his findings. The first stems from the fact that the accused's questioned hairs were few in number and the "additional standards" were "all short, representing root segments, which also are not mature and worn, as is always true of fallen hairs." The second uncertainty is based on the fact that "all statistical studies" of hair morphology are founded on studies "of Americans, or Europeans," both of which "are mixed races with great individual variations." Further uncertainty exists in applying these Western race statistics to the Oriental and

Pacific groups, particularly since the "amount of these [morphological] differences has not yet been determined."

It is arguable that, in substance, Dr. Kirk's opinion is no more firmly based than Dr. Kuwashima's and that each presents no more than a "percentage of possibility" which "is rather low." First, there are the admitted general uncertainties which cloud Dr. Kirk's conclusions. Second, there are gaps in his specifics. For example, he says that scale pattern and scale count are characteristics of "great value." He determined that the scale count and range of the brown hair found on Yumiko's dress do not "separate clearly from" the accused's hair standard used by Dr. Kuwashima, but nonetheless he maintains there "is not good agreement." He also contends the color of this hair is darker than the trial standard, but he admits it corresponds to the color of at least one of the several post-trial standards submitted to him.

Similar questions arise in connection with the analysis of the pubic hairs. Dr. Kirk maintains the pubic hairs found in the victim's vaginal area are distinguishable from the standards submitted to him in color, scale margin, and pigmentation. However, in his report he describes the color of one of the vaginal hairs as "yellow-brown" and that of the other as "light brown." And he indicates that six of his twelve standards are "light brown" and the others range from "brown to yellow-brown." Referring to one of the standards used by Dr. Kuwashima he describes the color as "light brown." It also appears that there are areas of agreement between the vaginal hairs and the standards which Dr. Kirk does not analyze. For example, one of the standards used by Dr. Kuwashima is described by Dr. Kirk as showing "intermittent medullation"; he applies the same description to one of the vaginal hairs and calls the other "partially medullated."

In its most favorable light, Dr. Kirk's report produces no more than a conflict in expert testimony on a point which the court-martial was expressly informed offered no more than a new fact to support his present asser-

"rather low" percentage of possibility of identity. In our opinion, this is not enough to require a new trial. The record makes manifest that the matters important to the court-martial were the identification of the accused by means of his car and his clothing, his calculated lies about the clothing he wore, the places he visited on the night of the murder, and the unexplained presence of human blood in his car and on his clothing. It is indeed significant that the accused has not offered a single new independent fact as to where he was and what he did on the night of the murder, which would even tend to blunt the force of the evidence against him.

We conclude, therefore, that there is no substantial basis for granting a new trial.

We have considered, either directly or in substance, every error alleged by the trial defense counsel in his appellate brief, and by appellate defense counsel appointed to represent the accused before this Court. We commend both of them for their obviously earnest and painstaking efforts on behalf of the accused. The briefs filed in this Court reflect most favorably upon their professional ability. There is, however, an implied claim of error by the accused personally which they have set out without comment.

In his request for appellate defense counsel before the board of review the accused said: "At my court martial trial my counsel advised me to remain silent, which I did. As I am innocent. . . ." The meaning of the accused's remarks is not clear. But there seems to be an implied criticism of trial defense counsel for alleged misadvice. If it is so intended, the allegation is thoroughly inconsistent with the accused's representation to the staff judge advocate in the post-trial interview that he had been well represented by his defense counsel and thought he "had done an excellent job." Aside from the inconsistency, there is no justification in the record for the contention. Besides, the accused has not presented a single new fact to support his present asser-

tion of innocence. We find no merit whatever in the implied complaint of lack of competency on the part of trial defense counsel. The record of trial is eloquent testimony to the contrary.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur with the Chief Judge.

A man's life depends upon the concurrence of two members of this Court. For that reason, since I join in affirming the findings and sentence, I prefer to make a few observations.

This was an excellently defended case at the trial level, and appellate defense counsel have done a superior job in presenting to us the strongest possible arguments to support a reversal. However, in reviewing the record, including the petition for new trial, the only question which I believe merits discussion is the sufficiency of the evidence to support the findings. In that connection, it is well to remember that in the field of sufficiency, a circumstantial evidence case may pose to an appellate tribunal the most difficult problem of all. At the trial level, each bit of evidence in the record must be considered with respect to whether it fits in with a hypothesis of innocence or one of guilt, and there the court-martial must find that it excludes all hypotheses of innocence. If at this level we repeat the same process, we step out of character and merely substitute our conclusions for those of the original triers of fact without the benefit of many guides available to those who observed and heard the witnesses. I do not understand that the Chief Judge, in carefully and fully setting out the facts and in advancing possible theories to support the findings, is suggesting a resolution of guilt or innocence by us. I believe he is merely outlining possible theories by which the court-martial could have reconciled such inconsistencies as may exist and properly arrived at its verdict. Of course, it can be argued, as it was by defense counsel, that some facts in this record have a tendency to point the finger of guilt directly away from accused and thus lend support to a hypothesis of innocence. On the other hand, counsel for the Government marshal the facts and contend they point unerringly toward him as the perpetrator of the murder. The arguments are excellent, but they more properly belong in the trial forum or before the board of review. The limited sphere of our consideration of the evidence is to ascertain whether, as a matter of law, it is sufficient to support the findings of the court-martial.

In United States v O'Neal, 1 USCMA 138, 2 CMR 44, I took the view supported by substantial authority that the true test for sufficiency of evidence at this level is: "If there is some substantial evidence in the record which permits the court-martial to conclude the accused is guilty beyond a reasonable doubt then we are not permitted to reverse because we might or can draw a different conclusion." I use that same measuring rod in this instance and, when I do, I find there is ample evidence in this record to support the findings made by the lower tribunals with fact-finding powers. The Chief Judge's opinion sets forth the salient facts and many of the inferences which support my conclusion. That he and I find sufficient evidence to support the verdict at this appellate level does not say reasonable men could not differ. It does suggest, however, that the six commissioned officers and the four non-commissioned officers who composed the court-martial, the convening authority, and the two officers of the board of review who joined in the majority opinion were convinced beyond a reasonable doubt that the accused was guilty and that the evidence excluded all reasonable hypotheses of innocence. There is in law a basis to support those beliefs and we can require no more.

I, therefore, join in affirming the decision of the board of review and agree there is no basis for granting a new trial.

FERGUSON, Judge (dissenting):

I dissent.

Because of the death penalty, this

case reaches us for a mandatory review by virtue of the Uniform Code of Military Justice.

At the outset of the case, the accused moved for a change of venue on the basis of intense public prejudice on Okinawa and the disqualification of the convening authority, who was also the civilian governor of the Ryukyus group. The law officer denied the defense motion. This motion was supported by introducing a summary of the daily Okinawan Press for the period of September 6th through November 9th, 1955. Also introduced was the substance of a staff conference held by the convening authority on September 21st, a press conference held by the staff judge advocate on the 16th of September, and a meeting of the Ryukyuan-American Community Relations Advisory Council on the 16th of September. The Government offered no evidence in opposition to the defense's motion. The law officer denied the defense's motion for change of venue on the ground there was no showing that the military shared the local prejudice, and denied without comment both the motion going to the convening authority's disqualification and a motion for a new court to be appointed from outside that command. In this I think the law officer was in error. The record clearly shows the feeling of the local community as well as the responsive concern of the military. The fact that the convening authority and the staff judge advocate held meetings with the local populace indicates the attitude of the military in relation to the question involved. Anyone who has served in these important capacities in foreign lands realizes the importance which is placed upon the attitude of the native people. Therefore, the feeling that was generated by the action of the local community was reflected in the action of the military as is indicated by the trial counsel's statement at the close of the hearing that: "I have a responsibility to the United States other than the mere conduct of this trial." He requested that he be allowed to give the local press information on the hearing which was taking place out of their hearing. Of course, this was denied by the law officer but it indicates the attitude of the military in relation to the local issues. There can be no doubt from the record that the press reports of the local papers were conveyed to the military authorities. Indeed they reflect that the convening authority, General Moore, was fully aware of the situation and its danger. General Moore and General Burger expressly recognized that this case had become a focal point for any political demands predicated upon the intense emotion which had been invoked and the distinct possibility of violence. General Moore also referred frequently to the situation as one which might get out of hand. He indicated the military community was very disturbed by the problem and he would see to it that all men and officers were aware of the situation. The record clearly indicates the intense emotion evoked by the case among the Okinawan populace. That the feeling of the local populace affected the military is highlighted by one incident. The staff judge advocate telegraphed to the Department of the Army requesting that, if the convening authority approved a death sentence, the accused be kept on Okinawa and the sentence be executed there.

No hardship would have been placed upon the Government to have geographically removed this case for trial or to have brought in new court-martial members in order that the accused receive a completely impartial trial.

When the accused was taken into custody on September 6th and asked by investigating officers if he knew why they wanted to talk to him, the arresting Government agent testified the accused replied he "read about the little girl's being killed in the newspaper." This statement was procured from the accused without an Article 31 (Uniform Code of Military Justice, 10 USC § 831) warning. The majority opinion applies the rule of waiver in this case. In view of the fact that this is a capital case, I would not do so.

It should not be overlooked that one member of the board of review dis-

sented upon the question of sufficiency of the evidence.

As I study this evidence, I am brought to the conclusion that the testimony concerning the hair given by the expert witness, Dr. Kuwashima, at the trial, was highly relevant as to whether or not the accused committed this crime. It is of much greater importance than many of the other pieces of evidence on this point. To demonstrate this, I must refer to the conclusions of Dr. Kirk, whose testimony would be introduced at the new trial and which is the basis of the motion therefor.

As a basis for the defense motion for a new trial, they have introduced the proposed expert testimony of Dr. Kirk, who stated:

"*Summary:*

"In order to state that two hairs could have had a common source, it is *essential that all morphological factors fall within a common statistical range.* In addition, if the hairs have a common origin, it is probable that two, from two different sources, can be found that agree throughout. When adequate standards are available, this criterion is generally essential also.

"In no instance were any hairs found on either the victim's person, or his clothing, that matched any standard hair of Hurt in all morphological features. Furthermore, in no instance was any hair found on the victim that was within the statistical range of standard hairs of Hurt with respect to all morphological features.

"*There is no evidence whatever that any of the hairs found on the victim were from defendant Hurt,* nor was it even possible for them to have been from him.

"This conclusion is completely positive with regard to head hairs, which were, in all respects, distinguishable from his. The discrimination on the pubic hairs was less decisive, partly, at least, because far less is know of pubic hairs than of head hairs; partly because pubic hairs are more variable than head hairs.

"When all morphological features were studied, every hair found in the defendant's car was clearly distinguishable from standard head hairs of the victim. The similarity of color was obvious in several hairs, but the similarities ended there, and discrimination between hairs was very decisive. It is obvious that hairs from several people were present in the car, and that none of them were from the victim."

The majority opinion states they deny a new trial because "In its most favorable light, Dr. Kirk's report produces no more than a conflict in expert testimony on a point which the court-martial was expressly informed offered no more than a 'rather low' percentage of possibility of identity." I come to just the opposite view. Dr. Kuwashima's testimony was the only evidence directly linking the accused with the murder victim. It went uncontradicted. Dr. Kirk's present proposed testimony might well raise a reasonable doubt in this regard in the minds of the court-martial members, should a new trial be granted.

It should be kept in mind that the trial of this capital case took place in Okinawa, approximately 5800 miles from Dr. Kirk's University of California residence. In my view, Dr. Kirk's present testimony is newly discovered evidence.

In this connection see Taylor v State, 180 Tenn 62, 171 SW2d 403 (1943), where two witnesses had been unavailable at the first trial. In ordering the second trial, the appellate court said:

"It is possible that the trial judge took the view that the evidence was not newly discovered, since defendant and counsel knew of it during and before the trial. But, although not newly discovered evidence, in the usual sense of the term, its *availability* is newly discovered, to which the same principle applies."

When we consider everything which went on in Okinawa at the time of the preparation for this trial, we can see

that the accused would have been in no position through his military counsel to insist upon delay of the case until he could have procured the testimony of expert witnesses in the United States.

As to whether or not the accused exercised due diligence in only now presenting Dr. Kirk's proposed testimony as the basis for a new trial, see Eastern Rock Island Plow Co. v Stout, 84 Ind App 217, 147 NE 160 (1925), where it was said:

"Referring to the first question: The courts often use the expression 'due diligence.' Due diligence means that quantum of diligence which the law requires. Statements of that kind are, of course, indefinite. Because of the inherent nature of the subject, the most definite general statement that can be made is that to entitle a litigant to a new trial on the ground of newly discovered evidence he must show that he exercised reasonable diligence. That must be the rule; for surely the courts should not require of any litigant that which is unreasonable. And that is the rule generally recognized by the courts."

In that case it was also said:

"A complaint for a new trial on the ground of newly discovered evidence, pursuant to section 589, Burns' 1914, must be regarded as a substitute for a bill in chancery. See Moore v Coates, 35 Ohio St. 177. The trial court must determine, in the first instance, whether the proof is clear, strong, and satisfactory; whether an injustice has been done; whether the plaintiff has exercised reasonable diligence; and whether the ends of justice require that a new trial be granted. In passing on each case the trial court exercises a legal discretion, and on appeal its judgment will be reversed only for the abuse of that discretion. It has been aptly said that—

'A court clothed with power to grant new trials must necessarily be vested with large discretion.' Moore v Coates, supra."

This Court is clothed with this power to grant new trials. We certainly should exercise this discretion in favor of this accused on this record.

In addition, there is another point which gravely concerns me. The record shows that fifteen ■■■■■■■■■ the prosecution witnesses were affirmed, rather than sworn. *The form of affirmation is not disclosed by the record but it is clear only four of these unsworn witnesses were asked whether or not they were Christians.* Of the remaining eleven, ten were interrogated as to their understanding of a promise and one was not even asked this. This one witness was Dr. Kuwashima. The swearing of witnesses is certainly an important predicate of our system of jurisprudence. Affirmation is proper only if it is first ascertained why the witness cannot take an oath. In State v Levine, 109 NJ Law 503, 162 Atl 909 (1932), the court said:

"Under the common law, no person could be a witness in a judicial proceeding unless he believed that there was a god and that that god would punish him if he swore falsely. Omichund v Barker, 1 Atk 21, 11 English Ruling Cases 126 (A D 1744). The common law, except in so far as it has been altered or repealed by statute, is the law to-day. Constitution, art. 10, par. 1.

• • • • •

"So Bouvier's Dictionary defines an affirmation as 'a solemn religious asseveration in the nature of an oath.' Greenleaf on Evidence (16th Ed) vol. 1, § 364b, says: *'All witnesses are to be sworn according to the peculiar ceremonies of their own religion, or in such manner as they may deem binding on their own consciences. If the witness is not of the Christian religion, the Court will inquire as to the form in which an oath is administered in his own country, or among those of his own faith, and will impose it in that form."* [Emphasis supplied.]

In 39 Am Jur, Oath and Affirmation, § 2, the following appears:

"In its broadest sense, an oath is any form of attestation by which a

person signifies that he is bound in conscience to perform an act faithfully and truthfully. It involves the idea of calling on God to witness what is averred as truth, and it is supposed to be accompanied with an invocation of His vengeance, or a renunciation of His favor, in the event of falsehood.

"The word 'oath' has been construed to include 'affirmation' in cases where, by law, an affirmation may be substituted for an oath."

I feel that this Court should have heard oral argument on the defense motion for a new trial predicated upon newly discovered evidence. Certainly a convicted person is entitled to such before this Court when faced with the death penalty.

I would grant the motion for a new trial.